1   **Guttilla & Murphy, PC**
    **Firm No. 00133300**
2   **Ryan W. Anderson (No. 020974)**
    **Alisan M. B. Patten (No. 009795)**
3   **4150 West Northern Ave.**
    **Phoenix, Arizona  85051**
    **(623) 937-2795**
4   **randerson@gamlaw.com**
    **ampatten@cox.net**

5   Attorneys for the Receiver

6               IN THE UNITED STATES DISTRICT COURT

7                  FOR THE DISTRICT OF ARIZONA

8   Lawrence J. Warfield, Receiver,        )
                                           )        Cause No. CV 03-2390 PHX JAT
9              Plaintiff,                   )
                                           )   RECEIVER'S STATEMENT OF FACTS
10  v.                                     )    IN SUPPORT OF HIS MOTION FOR
                                           )      PARTIAL SUMMARY JUDGMENT
    Michael Alaniz, et al.                 )   AGAINST DEFENDANTS:  LEONARD
11                                         )   AND ELIZABETH BESTGEN, RENALD
               Defendants.                 )   BIDWELL, ROBERT CARROLL, RUDY
12                                         )    AND MARY CROSSWELL, CHARLES
                                           )     DAVIS, RICHARD DERK, ORVILLE
13                                         )    DALE FRAZIER, RONALD KERHER,
                                           )     DWIGHT LANKFORD, JOHN AND
14                                         )    CANDES RADA, PAUL RICHARD
                                           )       AND PATRICK WEHRLY
15                                         )
                                           )
16  _____   )

17          Plaintiff, Lawrence J. Warfield as Receiver for Mid-America Foundation, Inc.

18  (hereafter referenced as "MAF") and Mid-America Financial Group, Inc. (hereafter

19  referenced as"MAFG") pursuant to Rule 56(a), Fed. R. Civ. P. and Rule 56.1, Local

20  Rules of Civil Procedure, submits the following Statement of Facts in support of his

21  Motion for Partial Summary Judgment against Defendants Bestgens, Bidwell, Carroll,

22  Crosswells, Davis, Derk, Frazier, Kerher, Lankford, Rada, Richard and Wehrly.

23

*Guttilla & Murphy, PC*
*4150 West Northern Ave*
*Phoenix, Arizona 85051*
*(623) 937-2795*

STATEMENT OF FACTS

**A.      The Ponzi scheme**

1.      The MAF charitable gift annuities (hereafter referenced as "CGAs") promised a stream of income to the annuitants named in the CGAs for a specific lifetime and that monies remaining after that lifetime would be directed to a charity designated by those who purchased the MAF CGAs.  (*See,* attached *Mid-America Foundation, Inc., Brochures* marked as Exhibit 1.)

2.      In 1996, Robert Dillie, caused MAF to begin selling MAF CGAs.  Dillie utilized financial advisors, insurance agents and others throughout the United States to market and sell the MAF CGAs.  Under the MAF program, the investor would make a large contribution to MAF of cash, real property, or marketable securities in exchange for a MAF CGA under which MAF promised to make periodic annuity payments to the investor for the remainder of the investor's life and in some cases for the life of another, and contribute an amount to a designated charity upon the end of the annuity payments. In accepting these contributions and making these promises, MAF was obligated to reserve sufficient funds to insure its ability to make the promised annuity payments and charitable contributions.  MAF, however, did not reserve funds but instead operated a Ponzi scheme whereby annuity payments were funded, not by the investment earnings, but by the funds received from subsequent investors. (*See,* attached *Declaration of Receiver Lawrence J. Warfield, ¶8* marked as Exhibit 2.)

3.      From October 1996 through December 2001:

a.  Dillie raised more that $55 million dollars from the sale of over 403 MAF CGAs.

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

**Guttilla & Murphy, PC**
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

b.  Virtually all of the funds received into the accounts were obtained from investors who had purchased MAF CGAs.  For the reason all of the funds deposited into the accounts are referred to hereafter as Investor Funds.

c.  With limited exceptions which are described below, none of the Investor Funds were invested to provide a source of investment income to fund future annuity obligations.

d.  Except as noted otherwise in the Receiver's Declaration, Investor Funds were almost always transferred to other accounts controlled by Dillie (including accounts in the name of MAFG) where they were used to make annuity payments to earlier investors, commission payments to facilitators who assisted in bringing new investors to MAF, payments to Dillie and others for personal expenses including Dillie's gambling expenses, and payments of various operating expenses incurred in the process of operating MAF & MAFG.

e.  Dillie, through MAF, operated a Ponzi scheme in which new Investor Funds were sought and obtained in order to make the periodic annuity payments promised to earlier investors, as well as the other expenditures noted above.

f.  Dillie did not reserve funds in order to make the charitable contributions to charities that he promised the MAF Investors and therefore, except for a few minor amounts, the promised contributions were not made.

(*See,* attached *Declaration of Receiver Lawrence J. Warfield, ¶*11 marked as Exhibit 2.)

3

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

4.     MAF was insolvent shortly after it began to sell MAF CGAs in 1996 and that insolvency worsened as the sales of CGAs continued in subsequent years.  (*See,* attached *Declaration of Lawrence J. Warfield,* ¶12, marked as Exhibit 2.)

5.     MAF was insolvent at the time each MAF CGA was sold and it remained insolvent continuously thereafter.  (*See,* attached *Declaration of Receiver Lawrence J. Warfield,* ¶15 marked as Exhibit 2.)

6.     At the time of the payment of commissions to the defendants in connection with the sale of the MAF CGAs identified herein, *infra,* MAF was insolvent and remained insolvent continuously thereafter.  (*See* attached *Declaration of Receiver Lawrence J. Warfield*, ¶16 marked as Exhibit 2.)

7.     A letter dated October 12, 2001 was addressed to purchasers of Mid-America Foundation, Inc., CGAs by Robert Dillie admitting to the insolvency of Mid-America Foundation, Inc.  (*See,* attached *letter dated October 12, 2001,* marked as Exhibit 6.)

8.     On February 6, 2003, Robert Dillie was indicted in U.S. District Court for the District of Arizona in *U.S. v. Robert Roy Dillie,* CR-03-115-PHX-DGC on 193 counts related to the operation of a Ponzi scheme where MAF and MAFG were used by Dillie to sell fraudulent CGAs.  (*See,* attached *Indictment* marked as Exhibit 7.)

9.     On October 31, 2005, Robert Dillie entered a guilty plea to the following: count one of the Indictment in *U.S. v. Robert Roy Dillie,* CR-03-115-PHX-DGC (fraud by wire); count twenty-one of the Indictment (money laundering-concealing the proceeds of unlawful activity); and, count one hundred thirty-five (money laundering-transacting in property derived from unlawful activity.  (*See,* attached *Minute Entry and Transcript*

1  *in U.S. v. Robert Roy Dillie,* CR-03-115-PHX-DGC marked as Exhibit 7.)  Sentencing is

2  scheduled for January 30, 2006.  (*See*, attached *Minute Entry and Transcript in U.S. v.*

3  *Robert Roy Dillie,* CR-03-115-PHX-DGC marked as Exhibit 7.)

4  **B.      MAF was incorporated in the State of Delaware on June 13, 1997.**

5      1.      MAF was incorporated in the State of Delaware on June 13, 1997.  MAFG

6  was incorporated in Delaware on June 13, 1997.  (*See,* attached *Articles of Incorporation*

7  marked as Exhibits 4 and 5.)

8  **C.      Robert Dillie has a long, established public history of violating state**

9  **regulations involving his insurance license resulting in regulatory disciplinary action**

10  **in several states.**

11      1.      On or about February 12, 1990, the Wisconsin Commissioner of Insurance

12  accepted the surrender of Robert Dillie's insurance license after the Commissioner

13  alleged that Dillie had failed to provide a full and complete response to inquiries from the

14  Commissioner and had failed to retain policyholder records in compliance with

15  applicable rules.  Although Dillie denied the allegations, as well as denying that in a

16  number of instances he had collected premiums and failed to remit all or part of the

17  premiums to insurers, he agreed to the surrender of his insurance license and to not

18  reapply for a license for approximately five years. (*See*, attached *"Stipulation and Order,*

19  *Case No. 88-C20358"* marked as Exhibit 8.)

20      2.      On or about May 16, 1996, Dillie was fined $100 by the State of Colorado,

21  Division of Insurance for failing to disclose in an insurance license application that the

22  State of Wisconsin had taken action against him in 1990.  (*See,* attached *letter dated May*

23  *16, 1996* marked as Exhibit 9.)

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

3. On or about October 9, 1996, the State of Wisconsin, Office of the Commissioner of Insurance denied Dillie's application for an insurance license because he failed to disclose that previous administrative action had been taken against him in the state of Wisconsin. (*See,* attached *letter dated October 9, 1996* marked as Exhibit 8.)

4. On or about December 17, 1997, the State of Illinois, Department of Insurance denied Dillie's application for an insurance license based upon material misrepresentations in his license application wherein Dillie stated that he had not had any disciplinary action taken against him in any state thereby failing to acknowledge and disclose the surrender of his insurance license to the Office of the Commissioner of Insurance, State of Wisconsin on February 12, 1990, the denial of his insurance license on October 9, 1996 by the State of Wisconsin, Office of the Commissioner of Insurance and the penalty instituted against him by the State of Colorado in 1997. (*See,* attached *letter dated December 17, 1997* marked as Exhibit 10.)

5. On or about July 14, 1999, Dillie's Arizona life insurance license was "deemed expired" as of May 31, 1999 based upon a "Consent Order" in which Dillie was found to have not disclosed his licensing history in an insurance application submitted to the State of Arizona, Department of Insurance. The "Consent Order" stated that Dillie would not be permitted to reapply for an Arizona insurance license for a period of one year and that he was to pay a civil penalty in the amount of $2,000.00. (*See,* attached *"Consent Order"* in *In the Matter of Robert Roy Dillie, No. 99A0116-Ins* marked as Exhibit 11.)

**Guttilla & Murphy, PC**
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

**D.     The MAF CGA marketing materials**

The MAF CGA brochures promised annuitants that a MAF CGA would provide them with a stream of income, tax advantages, and a vehicle by which they could make a donation to a charity of their choice upon their death. Additionally, the brochures stated that MAF had current assets from which to pay the stream of annuity payments promised under the MAF CGAs. (*See*, attached *MAF Sales Brochures* marked as Exhibit 1).

**E.     Selling the MAF CGAs**

1.     Defendant Lankford testified under oath that in order to purchase a MAF CGA, typically payment to MAF was made by check or through the transfer of stock owned by the victims of the Ponzi scheme.  The stock would be liquidated and then Mid-America Foundation would convert the [ownership] of the stock.  (*See,* attached *Lankford Deposition Transcript* at 89:14-25; 90:1-25; 91:1-25; 92:1-20 marked as Exhibit 12.)

**F.     The sale of MAF CGAs**

**1.  Charitable Gift Annuities sold in California**

**a. Defendant Robert Carroll**

i.     Defendant Carroll identified himself as a graduate of law school.  He stated that he held an insurance license from the State of California as of 1991.  (*See,* attached *letter dated November 12, 2001 from Defendant Carroll to Tammy Collett* marked as Exhibit 13; *insurance license certificate for Robert Carroll from the California Department of Insurance* marked as Exhibit 14.)  Defendant Carroll claims to have held a Series 7 Securities License though it was expired at the time of Defendant Carroll's MAF CGA sales.  (*See,* attached Carroll *Response to Receiver's Interrogatory No. 22* marked as Exhibit 15.)  He also claims to have been certified as a "certified senior

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

7

advisor" since 1999.  (*See,* attached *Carroll Deposition Transcript* at 14:9-21, 23-24 marked as Exhibit 16).

ii.     Defendant Carroll signed a "Mid-America Foundation Gift Annuity Agent Compensation Agreement" with MAF on September 23, 1997.  (*See,* attached copy of *"Mid-America Foundation Gift Annuity Agent Compensation Agreement"* between Carroll and Mid-America marked as Exhibit 17; *Carroll Deposition Transcript* at 23:18-25; 24:1-18 marked as Exhibit 16).

iii.    In 1999 and 2000, Defendant Carroll sold two MAF CGAs in California as summarized in the table below:

| CGA No. | CGA Application Date | Issuance Date | Names | Commission of Purchasers Paid |
|---|---|---|---|---|
| 1. 20854 | 6-8-00 | 6-29-00 | M. Peterson | $72,822.23 |
| 2. 20481 | unknown | 10-29-97 | K. and E. McMillan | $10,704.33 |
| Total | | | | **$83,526.56** |

| CGA No. | Approximate age(s) of purchaser(s) at time of CGA application |
|---|---|
| 1. 20854 | 84 |
| 2. 20481 | 82, 82 |

*(See,* attached *copies of CGA applications, CGAs, and evidence of payment of commissions related thereto* marked as Exhibits 19 & 20).

iv.    **Defendant Carroll admits that he received a total of $83,526.56 in commissions for the sale of CGAs sold by MAF or MAFG.**  (*See,* attached *Carroll Response to Receiver's Interrogatory No. 10* marked as Exhibit 15;

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

8

1 | attached *Rada Defendants' Amended Response to Request for Admissions No. 2* marked

2 | as Exhibit 20.)

3 |     v.     Defendant Carroll admits that prior to his sale of MAF CGAs,

4 | he did not confirm, from any source independent of MAF or MAFG or any persons

5 | associated with these two entities, that MAF was solvent and had sufficient assets to

6 | fulfill its CGAs obligations.  (*See,* attached *Carroll Response to Receiver's Request for*

7 | *Admission No. 22* marked as Exhibit 21.)

8 |     vi.     Defendant Carroll admits that prior to his sale of MAF CGAs,

9 | he did not request or possess an audited financial statement for MAF or MAFG prepared

10 | by a certified public accountant who acted independently of MAF or persons/entities

11 | related to those entities.  (*See,* attached *Carroll Response to Receiver's Request for*

12 | *Admission No. 28* and *Carroll Response to Receiver's Interrogatory No. 29* marked as

13 | Exhibits 21 and 15.)

14 |     vii.     Defendant Carroll admits that he did not seek or obtain

15 | information regarding MAF or MAFG or any of their key employees or officers and

16 | directors from sources other than Robert Dillie or other representatives of MAF or

17 | MAFG.  (*See,* attached *Carroll Response to Receiver's Interrogatories Nos. 8, 27* marked

18 | as Exhibit 15).

19 |     viii.     Defendant Carroll stated that to investigate the solvency of

20 | MAF in 2000 he found the National Community Foundation to be similar and

21 | "[k]nowing that Dillie affiliated with V.P. Dan Quayle."  (*See,* attached *Carroll Response*

22 | *to Receiver's Interrogatory No. 21* marked as Exhibit 15.)

23 |

**Guttilla & Murphy, PC**
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

1           ix.      Defendant Carroll testified that he didn't recall telling

2  everyone that his purchaser-victims, Mrs. Peterson or the McMillans, that he would be

3  paid a commission for his sale of MAF CGAs to them even though commonly he would

4  tell clients this information, as follows:

5                          Q: Did Ms. Petersen know before she died that you received
                          nearly 73,000 in commission for the sale of her CGA?
6                          A: I don't know.  I don't know that.
                          Q: Do you commonly tell your clients that you will receive a
7                          commission for products you sell?
                          A: Certainly.
8                          Q: But you don't recall telling Ms. Petersen that you get a –
                          A: No.
9                          Q: Are the McMillans still alive?
                          A: I don't know.
10                         Q: Did you at any time tell the McMillans that you would
                          receive a 10,000, be approximately a $10,000 commission?
11                         A: I don't know that either.

12  (*See,* attached *Carroll Deposition Transcript* at 86:5-20 marked as Exhibit 16.)

13          x.      Defendant Carroll testified that it was not his responsibility to

14  investigate MAF before selling its CGAs; that was the responsibility of "government

15  agencies."  Yet, Defendant Carroll failed to inquire with the very governmental agency

16  regulating the sales of CGAs in California to see if MAF was even authorized to sell its

17  CGAs.  (*See,* attached *Carroll Deposition Transcript* at 91:3-25; 92:1-5; 45:1-25; 46:1-10

18  marked as Exhibit 16.)

19          xi.      Defendant Carroll testified that the only information he relied

20  upon in selling the MAF CGAs was information that he received directly from Mid-

21  America. (*See*, attached *Carroll Deposition Transcript* at 93:13-25 marked as Exhibit

22  16.)

23

**Guttilla & Murphy, PC**
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

1             xii.    Defendant Carroll admitted that prior to selling the MAF

2    CGAs, he did not request any tax returns for MAF or MAFG.  (*See,* attached  *Carroll*

3    *Deposition Transcript* at 63:3-22, marked as Exhibit 16.)

4             xiii.    On December 14, 1999, in a matter not known to involve the

5    MAF CGAs and after selling one MAF CGA **but before selling the other**, "Desist and

6    Refrain Orders" were directed to Defendant Carroll ordering him to stop selling any

7    security in the State of California since he had offered or sold securities without having

8    been licensed as a broker-dealer in the State of California.  (*See,* attached *"Desist and*

9    *Refrain Orders"* marked as Exhibit 22).

**2.**     **MAF was *not* authorized to sell CGAs by the Commissioner of the California Department of Insurance.**

         a.    MAF was never issued a certificate of authority by the

Commissioner of the California Department of Insurance to sell annuities in that state.

(*See*, attached *Certified Statement of Pauline D'Andrea* marked as Exhibit 23).

**3.**     **Charitable gift annuities sold in Washington**

         **a.**    **Defendant Renald Bidwell**

         i.    Defendant Bidwell stated that he held an insurance license

since 1978 although he does not acknowledge from what state the license was issued.

(*See,* attached *Bidwell Response to Receiver's Interrogatory No. 22* marked as Exhibit

24).  Managed Financial Care, Inc., and Defendant Bidwell as a person authorized to

represent Managed Financial Care, Inc., were licensed to sell life and disability insurance

in the State of Washington from June 11, 1997 to June 11, 2001.  (*See,* attached

*certificates* marked as Exhibit 25).

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

ii.     Defendant Bidwell stated that he held securities licenses (series 63 and 7) from 1992 to 1996 (approximately).  (*See,* attached *Bidwell Response to Receiver's Interrogatory No. 22* marked as Exhibit 24.)  Accordingly, his securities licenses were no longer in effect at the time of his MAF CGA sales.

iii.     Defendant Bidwell signed an "Elite Associate Agreement," as president of Managed Financial Care, Inc., with MAFG and Mid-America Estate Planning, Inc., on March 23, 1999 in order to sell Mid-America "approved or authorized products".  (*See,* attached *"Elite Associate Agreement"* marked as Exhibit 26.)

iv.     In 1999, Defendant Bidwell sold two MAF CGAs in the State of Washington as summarized in the table below:

| CGA No. | CGA Application Date | Issuance Date | Names of Purchaser(s) | Commission Paid |
|---------|--------------------|---------------|----------------------|-----------------|
| 1.  20684 | unknown | 2-26-99 | L. Ostbye | $ 1,713.60 |
| 2.  20681 | 2-10-99 | 8-13-99 | S. Blacksten | $21,023.59 |

**TOTAL:**                                                                 **$22,737.19[1]**

| CGA No. | Approximate age(s) of purchaser(s) at time of CGA application |
|---------|-------------------------------------------------------------|
| 1. 20684 | 83 |
| 2. 20681 | 62 |

(*See,* attached *copies of CGA applications, CGAs, and evidence of payment of commissions related thereto* marked as Exhibits 27 and 28.)

**4.     Neither MAF nor MAFG were authorized to sell CGAs by the Commissioner of the Washington Department of Insurance.**

---

[1] Defendant Bidwell also sold a MAF CGA in Illinois as discussed, *infra.*

12

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

1        a.    Neither MAF nor MAFG were ever issued a certificate of authority

2    or certificate of exemption by the Commissioner of the Washington Department of

3    Insurance to sell charitable gift annuities in Washington.  (*See*, attached *Declaration of*

4    *James Tompkins, Assistant Deputy Commissioner, Office of the Washington Insurance*

5    *Commissioner; letter dated August 3, 1999 from the State of Washington Office of*

6    *Insurance Commissioner to Robert Dillie* marked as Exhibit 29; *Memorandum to George*

7    *Chant from Andrew J. Anderson dated August 25, 1999* marked as Exhibit 30.)

8        **5.**    **Charitable Gift Annuity sold in Illinois.**

9            **a.**    **Defendant Bidwell**

10           i.    Defendant Bidwell was not licensed to sell annuities in

11   Illinois.  (*See,* attached C*ertified Statement from the Department of Financial and*

12   *Professional Regulation Division of Insurance for the State of Illinois* marked as Exhibit

13   31.)

14           ii.    In 1999, Defendant Bidwell sold a MAF CGA in the State of

15   Illinois as summarized in the table below:

16

| CGA No. | CGA Application Date | Issuance Date | Names of Purchaser(s) | Commission Paid |
|---------|---------------------|---------------|----------------------|-----------------|
| 20748 | 8-27-99 | 9-23-99 | J. and E. Lofton | $    945.52 |

| CGA No. | Approximate age(s) of purchaser(s) at time of CGA application |
|---------|--------------------------------------------------------------|
| 20748 | 71, 73 |

**Total commissions paid to Defendant Bidwell for MAF CGAs in Washington and**

**Illinois:**        **$23,682.71**

*(See,* attached *copies of CGA applications, CGAs, and evidence of payment of commissions related thereto* marked as Exhibit 32.)

    iii. Defendant Bidwell responded to the Receiver's Interrogatory requests and stated that he had received $1,958.40 in commission on the L. Ostby[e] CGA, $21,022.59 in commission on the S. Blacksten CGA; and, $945.52 in commission on the J.C. Lofton CGA.  (*See,* attached *Bidwell Response to Receiver's Interrogatory No. 10* marked as Exhibit 24.)

    iv. Defendant Bidwell admitted that the only steps he undertook to investigate the financial solvency of MAF were to make two trips to meet with ". . . Robert Dillie and other officers and directors".  (*See,* attached *Bidwell Response to Receiver's Interrogatory No. 21* marked as Exhibit 24.)

    v. Defendant Bidwell admitted that prior to his sale of MAF CGAs, he did not possess an audited financial statement for MAF or MAFG prepared by a certified public accountant who acted independently of MAF or MAFG or persons/entities related to those entities.  Defendant Bidwell also admitted that he never even requested an audited financial statement for MAF or MAFG.  (*See*, attached *Bidwell Response to Receiver's Request to Admit No. 24* and *Bidwell Response to Receiver's Interrogatory No. 29* marked as Exhibit 24.)

    vi. Defendant Bidwell admitted that prior to his sale of MAF CGAs, he did not confirm from any source independent of MAF or MAFG or persons associated with these two entities, that MAF was solvent and had sufficient assets to fulfill its CGA obligations. (*See*, attached *Bidwell Response to Receiver's Request to Admit No. 22* marked as Exhibit 24.)

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

1     **6.      MAF had no authority to sell CGAs from the State of Illinois,**

2  **Department of Financial and Professional Regulation Division of Insurance.**

3        MAF never held any type of license or other authority from the State of Illinois,

4  Department of Financial and Professional Regulation Division of Insurance to sell any

5  insurance or annuity product in Illinois.  (*See,* attached *Certified Statements from the*

6  *Department of Financial and Professional Regulation Division of Insurance for the State*

7  *of Illinois* marked as Exhibit 31.)

8     **7.      Charitable gift annuities sold in Florida**

9        **a**.    **Defendant Richard Derk**

10              i.       At the time of his sale of MAF CGAs, Richard Derk claimed

11  he held a securities license and a Florida insurance license.  (*See,* attached *Derk*

12  *Deposition Transcript* at 19:3-25; 20:1-9 [regarding Florida insurance license and

13  "securities license" in general] marked as Exhibit 33; in the attached *Supplemental*

14  *Contracting Data form* marked as Exhibit 34, Derk  claimed to hold series 6, 7, 63 and 24

15  securities licenses.)

16              ii.      In the background information Derk provided to MAF, Derk

17  stated that his "financial background/experience" was "Tax & Accounts Practice since

18  1983 [and] Securities & Insurance 7+ years." (*See,* attached *Supplemental Contracting*

19  *Data form* marked as Exhibit 34.)  At his deposition, Defendant Derk admitted that he is

20  a CPA (certified public accountant).  (*See,* attached *Derk Deposition Transcript* at 17:17-

21  18 marked as Exhibit 33.)

22              iii.     On or about December 1, 2000, Derk entered into a

23  "Charitable Gift Annuity 'General Agent' Representation Agreement" with MAFG to sell

15

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

MAF CGAs.  (*See* attached *Derk Deposition Transcript* at 24:2-25; 25:1-4; Exhibit 2 to Derk Deposition Transcript marked as Exhibit 33.)

iv.     Between December 12, 2000 and December 4, 2000, Defendant Derk sold two Mid-America CGAs in Florida as summarized in the table below:

| CGA No. | CGA Application Date | Issuance Date | Names of Purchasers | Commission Paid |
|---|---|---|---|---|
| 1. 20892 | 12-12-00 | 1-04-01 | M. Cole | $ 8,295.00 |
| 2. 20883 | 12-4-00 | 12-5-00 | L. Taylor | $36,555.61 |
| **Total:** | | | | **$44,850.61** |

| CGA no. | Approximate age(s) of purchaser(s) at time of CGA application |
|---|---|
| 1. 20892 | 54 |
| 2.  20883 | 73 |

(*See,* attached *copies of CGA applications, CGAs, and evidence of payment of commissions related thereto* marked as Exhibits 35 and 36.)

v.     **Defendant Derk admits receiving $44,850.61 in commissions for the sale of his MAF CGAs.**  (*See,* attached *Rada Defendants' Amended Response to Request for Admissions No.2* marked as Exhibit 20; *Derk Response to Receiver's Interrogatory No. 10* marked as Exhibit 37.)

vi.     Defendant Derk was asked to identify all steps he took to investigate the financial solvency of MAF and to identify the dates upon which the steps were taken.  Defendant Derk responded that he received *unaudited* financial statements;

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

1   however, he could not recall the dates he received the unaudited financial statements.

2   (*See*, attached *Derk Response to Receiver's Interrogatory No. 21* marked as Exhibit 37.)

3           vii.    When asked to identify all steps that Defendant Derk took to

4   verify that MAF CGAs were authorized or approved for sale by the state in which Derk

5   sold them, Defendant Derk responded: "CGAs are not regulated in Florida.  Relied on

6   advice provided by Representatives of MAF." (*See,* attached *Derk Response to*

7   *Receiver's Interrogatory No. 24* marked as Exhibit 37.)

8           viii.   When asked whether he had ever requested a financial

9   statement for MAF or MAFG that had been prepared by an independent certified public

10  accountant, Derk responded: "No. Tom Bishop indicated there was an outside firm, but

11  no report."  (*See*, *attached Derk Response to Receiver's Interrogatory No. 29* marked as

12  Exhibit 37.)

13          xi.     Defendant Derk admitted that prior to his sale of MAF CGAs

14  that he did not possess an audited financial statement for MAF or MAFG prepared by a

15  certified public accountant who acted independently of MAF or MAFG or persons related

16  to those entities.  (*See*, attached *Derk Response to Receiver's Request to Admit No. 24*

17  marked as Exhibit 38.)

18          x.      At his deposition, Defendant Derk stated that he never asked

19  MAF for an audited financial statement; (*see*, attached *Derk Deposition Transcript* at

20  48:5-7 marked as Exhibit 33); he never asked to review MAF's IRS 990 forms (*see,*

21  attached *Derk Deposition Transcript* at 52:14-16 marked as Exhibit 33); he did not ask

22  MAF how it calculated its annuity payments nor did he ask questions about the annual

23  expenses of MAF (*see,* attached *Derk Deposition Transcript* at 53:13-14, 23-25 marked

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

17

as Exhibit 33); he did not ask MAF for independent confirmation that it maintained its assets under the management of Merrill Lynch (*see*, attached *Derk Deposition Transcript* at 54:1-12 marked as Exhibit 33); he did not take any steps to independently confirm that MAF's assets were managed by Merrill Lynch (*see*, attached *Derk Deposition* at 58:23-25; 59:1-4 marked as Exhibit 33); he did not ask MAF to put him in contact with any charities that had received residuum from a MAF CGA (*see,* attached *Derk Deposition Transcript* at 58:15-18 marked as Exhibit 33); nor did he take any steps to independently confirm MAF's assertion that it had $5,000,000 in invested funds (*see*, attached *Derk Deposition Transcript* at 64:13-19 marked as Exhibit 33.)

    **8.**     **MAF was never authorized to sell insurance in Florida.**

    a.     Neither MAF nor MAFG were ever authorized to sell insurance or annuities in the state of Florida. (*See,* attached *Certified Statement from the State of Florida Office of Insurance Regulation* marked as Exhibit 39 and *Certified statement from the Office of Financial Regulation for the State of Florida* marked as Exhibit 40.)

    **9.**     **Charitable gift annuities sold in Maine**

    **a.**     **Paul Richard**

        **i.**     **Licensing history, relationship with MAF and the sale of MAF CGAs.**

        A.     When asked to identify all professional licenses held by him, Defendant Richard stated that he held an insurance license from the State of Maine from February 1, 1989 until the present. He asserts that he is a college graduate. (*See*, attached *Richard Response to Receiver's Interrogatory No. 22* marked as Exhibit 41.)

        B.     In his August 1999, MAF "Precontracting Form"

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

Defendant Richard stated that his market/business specialty was "Insurance and trusts." (*See*, attached *PreContracting Form* marked as Exhibit 42.)  In response to a question asking him his financial background/experience in his August 1, 2000, "Supplemental Contracting Data" form, Defendant Richard stated: "30 years-Banking, Insurance & Estate Planning."  (*See,* attached *Supplemental Contracting Data form* marked as Exhibit 42.)

C.     Defendant Richard executed a "Mid-America Foundation Gift Annuity Agent Compensation Agreement" on or about November 24, 1997.  In the agreement, Richard warranted that he was an agent of MAF.  (*See,* attached *Richard Deposition Transcript* at 6:8-16; Exhibit 2 to Richard Deposition transcript marked as Exhibit 43.)

D.     Defendant Richard updated his compensation agreement with MAFG in 1999 and 2000.  (*See,* attached *Richard Deposition Transcript* at 22:3; 24:10-25; 26:1-19; 36:5; 39:1-12; 40: 1-25; 41:1-5 marked as Exhibit 43.)

F.     Between August 23, 1999 and December 22, 1999, Defendant Richard sold nine Mid-America CGAs all to the same person in Maine as summarized in the table below:

| CGA No. | CGA Application Date | Issuance Date | Names of Purchasers | Commission Paid |
|---------|---------------------|---------------|---------------------|-----------------|
| 20735 | 8-4-99 | 8-23-99 | S. Theimann, Jr. | $ 18,107.52 |
| 20745 | 8-11-99 | 8-30-99 | S. Theimann, Jr. | $ 16,680.55 |
| 20746 | 8-25-99 | 9-27-99 | S. Theimann, Jr. | $ 25,217.56 |
| 20749 | 9-1-99 | 9-27-99 | S. Theimann, Jr. | $ 13,804.62 |

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

19

| | | | | | |
|---|---|---|---|---|---|
| 1 | 20764 | 10-6-99 | 11-1-99 | S. Theimann, Jr. | $ 14,617.81 |
| 2 | 20773 | 10-27-99 | 12-9-99 | S. Theimann, Jr. | $ 44,805.46 |
| 3 | 20778 | 12-9-99 | 12-30-99 | S. Theimann, Jr. | $ 7,919.54 |
| 4 | 20804 | 12-27-99 | 1-27-00 | S. Theimann, Jr. | $ 1,741.43 |
| 5 | 20807 | 10-6-99 | 12-22-99 | S. Theimann, Jr | $ 972.45 |
| 6 | **Total:** | | | | **$143,866.94** |

| CGA No. | Approximate age(s) of purchaser(s) at time of CGA application |
|---|---|
| 20735 | 79 |
| 20745 | 79 |
| 20746 | 79 |
| 20749 | 79 |
| 20764 | 79 |
| 20773 | 79 |
| 20778 | 80 |
| 20804 | 80 |
| 20807 | 79 |

((*See,* attached *copies of CGA applications, CGAs, and evidence of payment of commissions related thereto* marked as Exhibits 43-52; *see,* attached *Richard Response to Receiver's Interrogatory No. 10* marked as Exhibit 41 where Defendant agrees with all of the Receiver's assertions as to amounts collected in commissions.  At his deposition, Defendant Richard admitted it was an error for his Response to Interrogatory 10 to include the receipt of a commission on alleged CGA No. 20844. *See,* attached *Richard*

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

1  *Response to Receiver's Request for Production of Documents No. 15* marked as Exhibit

2  53.)

3        **(ii)**    **Background of Defendant Richard's relationship with Mr.**

4  **Theimann.**

5        A.    Mr. Theimann did not know Defendant Richard before he

6  first called Mr. Theimann on the telephone. Mr. Theimann's name appeared on a list of

7  potential clients that Defendant Richard had received from a marketing source. (*See,*

8  attached *Richard Deposition Transcript* at 43:3-12; 45:22-24 marked as Exhibit 43.) Mr.

9  Theimann met with Defendant Richard who wanted to sell Mr. Theimann a product.

10  (*See,* attached *Richard Deposition Transcript* at 46:4-25; 47:1-25; 48:1-2 marked as

11  Exhibit 43.) The meeting took place at Mr. Theimann's home within a few days of

12  Defendant Richard's phone call. (*See,* attached *Richard Deposition Transcript* at 48:17-

13  19; 49:6-7 marked as Exhibit 43.) At the time Mr. Theimann was 79 years old. (*See,*

14  attached *Richard Deposition Transcript* at 50:5-6 marked as Exhibit 43.) No one else

15  was at the meeting other than Mr. Theimann and Defendant Richard. (*See,* attached

16  *Richard Deposition Transcript* at 50:9-11 marked as Exhibit 43.)

17        B.    Eventually, Defendant Richard sold nine MAF CGAs to Mr.

18  Theimann over the course of approximately six months. Every few weeks for six

19  months, Defendant Richard would return to Mr. Theimann's home so that Mr. Theimann

20  could give the Defendant more stock certificates Mr. Theimann had located so they could

21  be transferred to MAF and put into MAF CGAs. (*See,* attached *Richard Deposition*

22  *Transcript* at 59: 8-25; 60:1-21 marked as Exhibit 43.) Ultimately, Mr. Theimann paid a

23  total of approximately $2,211,000 in cash and securities, 80 percent of his life savings,

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

for MAF CGAs sold to him by Defendant Richard.  (*See,* Exhibits 7 & 8 attached to

Richard *Deposition Transcript* and 89:8-25; 90:1-6 marked as Exhibit 43.)

> **(iii).    The steps Defendant Richard took, or failed to take, in investigating MAF.**

A.    When asked to identify all information about MAF or MAFG

that Defendant Richard sought or obtained from sources other than Robert Dillie or

others related to MAF or MAFG, his response was: None.  (*See,* attached *Richard*

*Response to Receiver's Interrogatory Nos. 8 and 27* marked as Exhibit 41.)

B.    Defendant Richard stated the he took no steps directly or

indirectly to verify that MAF CGAs were authorized or approved for sale in Maine.  (*See,*

attached *Richard Response to Receiver's Interrogatory No. 24* marked as Exhibit 41.)

C.    Defendant Richard stated the he never requested a financial

statement for MAF or MAFG prepared by an independent certified public accountant.

(*See,* attached *Richard Response to Receiver's Interrogatory No. 29* marked as Exhibit

41.)

D.    Defendant Richard admitted that prior to his sale of MAF

CGAs he did not possess an audited financial statement for MAF or MAFG prepared by a

certified public accountant who acted independently of MAF or MAFG or persons related

to those two entities.  (*See,* attached *Richard Response to Receiver's Request to Admit*

*No. 2*4 marked as Exhibit 54.)

> **(iv.)   The State of Maine takes action against Defendant Richard.**

A.    On or about December 3, 2003, Defendant Paul Richard

entered into a Consent Judgment with the State of Maine and Securities Administrator in

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

*State of Maine and Securities Administrator v. Paul E. Richard*, Superior Court Civil

Action Docket No. CV-03-137.  In the Consent Judgment, Defendant Richard consented

to his permanent enjoinment from: 1) offering or selling securities in Maine or

transacting business as a securities broker-dealer or sales representative in Maine; 2) from

offering or selling any type of annuity or other product that contains an investment

component unless certain specific conditions were met; 3) from receiving referral fees or

other compensation for referring people to persons who provide living trust, wills or

similar products; 4) and, from holding himself out as providing any type of planning

services to the elderly.  Defendant Richard also agreed to being audited quarterly and to

pay a $23,000.00 fine to the Securities Administrator.  (*See* attached *Consent Judgment*

marked as Exhibit 8 to Richard Deposition Transcript marked as Exhibit 43.

        C.     All of these conditions arose from Defendant Richard's sale

of MAF CGAs to Smith P. Theimann. (One of the victims in this lawsuit as set forth

*supra.*)

        D.     Defendant Richard, as part of his Consent Judgment, admitted

the following facts:

     4.  Defendant Richard is an adult individual residing in Augusta, Maine.  At all times relevant hereto, Richard was not licensed as a securities broker-dealer or sales representative in the State of Maine.  Richard was and is an insurance agent doing business as 'Elder Planning Associates.'

     5.  From mid-1997 until late 2001, Richard had a contractual relationship with Mid-America Foundation, Inc. ('Mid-America'), under which Richard sold Mid-America's charitable gift annuities ('CGAs') in exchange for a 6-8% commission on sales and other compensation.

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

23

7.  The CGAs, as sold by Richard on behalf of Mid-America, provided for the investor to make an irrevocable gift of cash or securities to Mid-America. Mid-America in turn promised to pay a rate of return to the investor (in the form of periodic payments for the rest of the investor's life) and then transfer the principal to a designated charity upon the investor's death.

8.  In fact, the Mid-America CGAs were nothing more than a Ponzi scheme.  Mid-America used assets received from investors to make periodic payments to previous investors and to fund Mid-America's Executive Director Robert Dillie's lavish lifestyle, including huge Las Vegas gambling losses.

9. Between August 23, 1999 and January 27, 2000, Richard sold nine Mid-America CGAs to Smith P. Theimann, than an 80-year old retired social worker from Gardiner.  To purchase these CGAS, Mr. Theimann paid a total of approximately $2,211,000 in cash and securities – 80% of his life savings.

10. At no time did Richard disclose to Mr. Theimann that Mid-America was a Ponzi scheme or that Mr. Theimann's CGA investment would be used to pay other investors and to support Mid-America's Executive Director's lifestyle. Moreover, at no time did Richard disclose to Mr. Theimann that the CGAs were not registered as securities with the State of Maine or that Richard was not licensed to sell securities in the State of Maine.

11.  Mid-America paid Richard approximately $144,000 in commissions and other compensation for making the sale to Mr. Theimann.

12.  Although Mr. Theimann received some periodic payments, the payments ceased in mid-2001.  Soon thereafter, the Ponzi scheme collapsed, and Mr. Theimann's entire investment was lost.

(*See,* attached *Richard Deposition Transcript* 85:9-25; 86:1-25; 89:1-25; 90:1-6 and Exhibit 7 [¶¶ 4-12] and Exhibit 8 attached to the Transcript marked as Exhibit 43.)

**10.    MAF was never authorized to sell insurance in Maine.**

**a**.    There is no record of MAF having been licensed to sell insurance in Maine in 1999.  (*See*, attached letter from the *State of Maine Department of Professional and Financial Regulation, Bureau of Insurance* marked as Exhibit 55.)

**11.    Neither MAF nor MAFG were registered as foreign corporations to conduct business in Maine.**

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

1      **a**.      Neither MAF nor MAFG were incorporated in Maine nor were they

2  registered as a foreign corporation.  (*See,* attached *MAF and MAFG Articles of*

3  *Incorporation* marked as Exhibits 4 and 5 and *Certified Statements from the Department*

4  *of the Secretary of State for the State of Maine* marked as Exhibit 56.)

5      **12.      Charitable gift annuities sold in South Dakota**

6          **a.  Orville Dale Frazier**

7              i.      Defendant Frazier stated that he has held a Life and

8  Health insurance license from the State of South Dakota from 1995 to the present and

9  Series 6, 63 and 65 NASD securities licenses from 1998 to the present.  He also claims to

10  be a college graduate.  (*See,* attached *Frazier Response to Receiver's Interrogatory No.*

11  *22* marked as Exhibit 57.)

12              ii.      Defendant Frazier stated in a Precontracting Form with Mid-

13  America Companies that his market/business specialty was "Estate & Retirement

14  Planning."  (*See,* attached *Frazier Precontracting form* marked as Exhibit 58.)

15              iii.      Defendant Frazier sold CGAs for MAF in exchange for a

16  commission payment on all MAF CGAs sold by him, as demonstrated in the following

17  table. Orville Dale Frazier admitted he agreed to act in a "limited agency" relationship

18  with Mid-America Foundation prior to or at the time he sold Mid-America Foundation

19  CGAs.  (*See*, attached *Frazier Response to Receiver's Request to Admit No. 38* marked as

20  Exhibit 59.)

21              iv.      Between September 10, 1998 and August 28, 2001,

22  Defendant Frazier sold three Mid-America CGAs in South Dakota as summarized in the

23  table below:

**Guttilla & Murphy, PC**
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

25

| CGA No. | CGA Application Date | Issuance Date | Names of Purchasers | Commission Paid |
|---------|---------------------|---------------|---------------------|-----------------|
| 1. 20585 | 8-20-98 | 9-10-98 | E. L. Lucklum | $ 2,283.06 |
| 2. 20590 | 8-26-98 | 9-14-98 | W & S Mortenson | $36,000.00 |
| 3. 20929 | 7-06-01 | 8-28-01 | E. L. Lucklum | $ 1,951.85 |

**Total:**                                                                    **$40,234.91**

| CGA No. | Approximate age(s) of purchaser(s) at time of CGA Application |
|---------|---------------------------------------------------------------|
| 1. 205852 | 86 |
| 2. 20848 | 87 |
| 3. 20849 | 89 |

*(See,* attached *copies of CGA applications, CGAs, and evidence of payment of commissions related thereto* marked as Exhibits 60 to 62.)

    v.  **Defendant Frazier admits to receiving $40,234.91 in commission payments on the sale of MAF CGAs**.  (*See,* attached *Frazier Response to Receiver's Interrogatory No. 10* marked as Exhibit 57; *Rada Defendants' Amended Response to Request for Admissions No. 2 m*arked as Exhibit 20.)

    vi.  Defendant Frazier admitted that he sought or obtained no other information from sources other than Robert Dillie or other representatives of MAF or MAFG regarding MAF or MAFG or any of their key employees or officers and directors.  (*See,* attached *Frazier Response to Receiver's Interrogatory No. 8* marked as Exhibit 57.)

    vii.  Defendant Frazier admits that prior to his sale of MAF CGAs, he did not possess an audited financial statement for MAF or MAFG prepared by a

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

**Guttilla & Murphy, PC**
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

certified public accountant who acted independently of MAF or MAFG or persons related to those entities.  (*See*, attached *Frazier Response to Receiver's Interrogatory No. 29* marked as Exhibit 57; *Frazier Deposition Transcript* at 48:25; 49: 1-2 marked as Exhibit 63.)

> viii.    Defendant Frazier admitted that he had information that Robert Dillie was the president or CEO of MAF but he did not investigate the background of Dillie in the State of Arizona or any other state.  He did not confirm that Dillie had a license to sell insurance or annuities. (*See*, attached *Frazier Deposition Transcript* at 33:14-18; 34:3-16 marked as Exhibit 63.)  Further, he did not take steps independent of MAF to verify the licensing history of any other MAF Board Members. (*See,* attached *Frazier Response to Receiver's Interrogatory No. 27* marked as Exhibit 57.)

> ix.    Frazier admitted that he did not have a copy of MAF's tax returns [Form 990s].  (*See,* attached *Frazier Deposition Transcript* at 49:3-5 marked as Exhibit 63.)

> x.    Before Defendant Frazier sold any MAF CGAs, he thought that MAF's money was invested through Reinhardt Warble and Bowen ("RWB").  Nevertheless, although he attended a two to three day seminar at RWB before he sold the MAF CGAs, he never verified with anyone at RWB whether MAF money was invested through RWB.  (*See*, attached *Frazier Deposition Transcript* at 51:1-25; 52:1-25; 53:1-25; 54:1-14 marked as Exhibit 63.)

> xi.    Defendant Frazier did not ask MAF what formed the basis of MAF CGA's gift annuity rates (*see*, attached *Frazier Deposition Transcript* at 56:2-5

1   marked as Exhibit 63); he did not request an independent audit of MAF (*see,* attached

2   *Frazier Deposition Transcript* at 56:9-11 marked as Exhibit 63); he did not ask any

3   representatives of MAF how much of their assets were devoted to their its expenses (*see,*

4   attached *Frazier Deposition Transcript* at 56:18-24 marked as Exhibit 63); he did not ask

5   for proof that MAF maintained sufficient reserves to meet its annuity obligations (*see,*

6   attached *Frazier Deposition Transcript* at 56:25; 57:1-2 marked as Exhibit 63); he did not

7   request proof that the CGA donations were even invested (*see,* attached *Frazier*

8   *Deposition Transcript* at 58:1-3 marked as Exhibit 63); he did not ask if MAF tracked the

9   ongoing value of each Victim's donation so MAF could withdraw the correct residuum of

10  each MAF CGA gift (*see,* attached *Frazier Deposition Transcript* at  58:1-3 marked as

11  Exhibit 63);  and, Frazier never asked for a copy of MAF's IRS Form 990 tax returns

12  (*see*, attached *Frazier Deposition Transcript* at 58:1-3 marked as Exhibit 63.)

13              xii.     Defendant did not take any steps to verify the financial

14  solvency of MAF other than through communications with MAF.  (*See,* attached *Frazier*

15  *Response to Receiver's Interrogatories 8, 21 & 24* marked as Exhibit 57.)

16              **b**.     **Defendant Ronald Kerher**

17              i.     Defendant Kerher stated that he held a South Dakota life and

18  health insurance license from 1982 to the present.  (*See,* attached *Kerher Response to*

19  *Receiver's Interrogatory No. 22* marked as Exhibit 66.)

20              ii.     Defendant Kerher stated that he held NASD (National

21  Association of Securities License) license series no. 6 from 1982 to the present; series 7

22  from 1986 to the present; series 24 from 1994 to the present; series 63 from 1983 to the

23

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

present; and series 65 from 1998 to present. (*See,* attached *Kerher Response Receiver's Interrogatory No. 22* marked as Exhibit 66.)

        iii.    Defendant Kerher stated that he was a college graduate.  (*See,* attached *Kerher Response Receiver's Interrogatory No. 22* marked as Exhibit 66.)

        iv.    Defendant Kerher stated in a Precontracting Form with Mid-America Companies that his market/business specialty was "Retirement Planning and Estate Planning."  (*See,* attached *Kerher Deposition Transcript* at 8:7-10; 14:21-24 and exhibit 2 to Deposition Transcript marked as Exhibit 68.)

        v.    On or about June, 1999, Defendant Kerher executed a "Charitable Gift Annuity 'General Agent' Representation Agreement" ("contract one") and an "Independent Associate Agreement" with MAF ("contract two") wherein he agreed to act as an agent for Mid-America Foundation, Inc., (contract one) and Mid-America Estate Planning, Inc., and MAFG (contract two) for purposes of selling MAF CGAs in exchange for the payment of a commission. (*See*, attached *Kerher Deposition Transcript* at 44:18-25; 45:1-15; 52:16-25; 53:1-23 and exhibits 3 & 4 to Deposition Transcript marked as Exhibit 68.)

        vi.    In 1999, Defendant Kerher sold two Mid-America CGAs in South Dakota as summarized in the table below:

| CGA No. | CGA Application Date | Issuance Date | Names of Purchasers | Commission Paid |
|---------|---------------------|---------------|---------------------|-----------------|
| 1. 20697 | 3-29-99 | 4-16-99 | I. Mehlhaff | $ 1,280.00 |
| 2. 20704 | 4-23-99 | 5-28-99 | V. Park | $31,758.55 |
| **Total:** | | | | **$33,038.55** |

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

| CGA No. | Approximate age(s) of purchaser(s) at time of CGA Application |
|---------|--------------------------------------------------------------|
| 1. 20697 | 62 |
| 2. 20704 | 81 |

*(See,* attached *copies of CGA applications, CGAs, and evidence of payment of commissions related thereto* marked as Exhibits 64 and 65.)

        vii.   **Defendant Kerher admits to receiving $33,038.55 in commissions on the sale of MAF CGAs.** (*See,* attached *Kerher Response to Receiver's Interrogatory No. 10* marked as Exhibit 66; Rada *Defendants' Amended Response to Request for Admissions No. 2* marked as Exhibit 20.)

        viii.   When asked whether Defendant Kerher had ever requested a financial statement for MAF or MAFG prepared by an independent certified public accountant, Defendant Kerher answered:

> Defendant made requests for an audited financial statement in 1998. He received information from marketing people in the MAF office (Tom Bishop) and legal representatives (Sara Vanucci and Felicia Majewski). Those unaudited 'summary Profit and Loss' statements were received in approximately 1999 and have previously been disclosed. **Defendant requested Audited Financial Statements numerous times in 1999. When he did not receive an Audited Financial Statement, despite the fact that Defendant was told a Big Ten accounting firm was working on it, Defendant no longer solicited CGA sales. All sales by Defendant were completed in 1999.** (Emphasis added.)

*(See,* attached *Kerher Response to Receiver's Interrogatory No. 29* marked as Exhibit 66; *Kerher Responses to Receiver's Request to Admit Nos. 24 and 43* marked as Exhibit 67.)

        ix.   Defendant Kerher testified that he had requested an audited financial statement but received a "financial statement, but nothing audited." (*See,* attached *Kerher Deposition Transcript* at 76:20-24 marked as Exhibit 68.)

x.      When asked why Defendant Kerher requested audited financial statements from MAF or MAFG as referenced in his response to Receiver's Interrogatory No. 29, Defendant Kerher responded: "Defendant believed it to be prudent and reasonable to request audited financial statements." (*See*, attached *Kerher Response to Receiver's Interrogatory No. 35* marked as Exhibit 69.)

xi.      When asked to explain why Defendant Kerher's failure to receive an audited financial statement from MAF was so significant that it caused him to stop soliciting MAF CGA sales, Defendant Kerher responded: "Any company Defendant requests something from that does not provide the information or documentation would make Defendant consider looking elsewhere." (*See,* attached *Kerher Response Receiver's Interrogatory No. 36* marked as Exhibit 69.)

xii.      While being deposed on the what was to be gained by requesting an audited financial statement, Defendant Kerher answered "yes" when asked: "Would it be fair to say that you—that the Foundation would be required to make payments to your clients, and you wanted to ensure that it was financially sound—that Mid-America was financially sound?"  (*See,* attached *Kerher Deposition Transcript* at 76:7-19 marked as Exhibit 68.)

xiii.      When asked what financial information he had before selling a CGA to Verla Parks, Defendant Kerher admitted he had none explaining: "I probably didn't have any, and probably didn't need any at the time because Verla—I know Verla well enough that she would have looked at it and glanced at it and pushed it off to the side anyway, because she would have been believing what I was telling her." (*See a*ttached *Kerher Deposition Transcript* at 97:3-25; 98:1-6 marked as Exhibit 68.)

31

1    xiv.    Defendant Kerher testified that it was his understanding that

2  MAF may have had accounts with Merrill Lynch and RWB, Rinehart Werba Bowen.

3  (*See,* attached *Kerher Deposition* at 86:2-8 marked as Exhibit 68.)  When asked if

4  Defendant Kerher confirmed with RWB or Merrill Lynch that MAF had accounts with

5  them, Kerher testified: "What I said was I talked to RWB about other issues, which

6  would have been investing money or doing managed accounts for my –for clients of

7  mine.  And that during that conversation, I believe I asked them or stated to them, 'Oh, I

8  hear you're doing investments or funning an account for Mid-America.' And they said,

9  'Well, we can't verify anything.'" (*See,* attached *Kerher Deposition Transcript* at 87:25;

10  88:1-8 marked as Exhibit 68.)  He did not independently contact any representatives of

11  Merrill Lynch to confirm they managed Mid-America's money. (*See,* attached *Kerher*

12  *Deposition Transcript* at 88:16-20 marked as Exhibit 68.)

13    xv.    Defendant Kerher admitted that he never requested any

14  copies of MAF's tax returns (Form 990s)." (*See,* attached *Kerher Deposition Transcript*

15  at 69:6-13; 19-22 marked as Exhibit 68.)

16    xvi.    Defendant Kerher never asked MAF to put him in contact

17  with any charities that had received money from MAF. (*See,* attached *Kerher Deposition*

18  *Transcript* at 100:4-9 marked as Exhibit 68)

19    **13.  MAF was never authorized to sell insurance in South Dakota.**

20    MAF was never licensed to sell insurance in the State of South Dakota.  (*See*

21  attached *letter from South Dakota Department of Revenue & Regulation, Division of*

22  *Insurance* marked as Exhibit 70.)

23

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

**14.  Mid-America Foundation failed to file those documents necessary with the State of South Dakota in order to legally sell charitable gift annuities in that state.**

Mid-America Foundation, Inc., was never domiciled as a South Dakota charity (*see,* attached MAF articles of incorporation marked as Exhibit 4); MAF was never registered as a foreign corporation doing business in the State of South Dakota. (*See,* attached *Certified statement from the Office of the Secretary of State for the State of South Dakota* marked as Exhibit 71.)

**15.  Charitable gift annuities sold in Texas**

    a.  **Dwight Lankford**

       i.  Defendant Lankford stated that he held an insurance license from the State of Texas from 1997 to the present. (*See,* attached *Lankford Response to Receiver's Interrogatory No. 22* marked as Exhibit 72.)

       ii.  On or about August 26, 1997, Defendant Lankford executed a "Sales and Marketing Agreement" between Mid-America Living Trust Associates, Inc., and Lankford as president of Mid-America Estate Services, Inc., wherein Lankford was authorized to sell MAF CGAs.  (*See,* attached *Lankford Deposition Transcript* at 32:2-24, exhibit 2 to Deposition Transcript marked as Exhibit 73.)

       iii.  Defendant Lankford later explained at his deposition that Mid-America Estate Services was formed as a limited liability company not as a corporation and that the reference to it as a corporation in the August 26, 1997 "Sales and Marketing Agreement" was an error.  (*See,* attached *Lankford Deposition Transcript* at 32:1-24; 33:15-25 marked as Exhibit 73.)

iv.     In the "Sales and Marketing Agreement" described in paragraph 15. a. ii. *supra,* Lankford's limited liability company was authorized to market and sell MAF CGAs and market and sell estate planning documents produced by Mid-America Living Trust Associates, Inc. and insurance and related estate planning products marketed and sold by MAFG. (*See,* attached exhibit 2 to *Lankford Deposition Transcript* marked as Exhibit 73, paragraph 1.1.)

v.     Defendant Lankford, as president of his limited liability company, agreed to use his best efforts to market and sell one million dollars, $1,000,000.00, in insurance premiums and annuities per week. (See attached exhibit 2 to *Lankford Deposition Transcript* marked as Exhibit 73, paragraph 3.1.)

vi.     Under the August 26, 1997 "Sales and Marketing Agreement," Lankford's limited liability company was to receive a commission for its CGA sales on a case by case basis and would be paid $4900 per week for sales and marketing expenses of Mid-America products.  (*See,* attached exhibit 2 to *Lankford Deposition Transcript* marked as Exhibit 73, paragraphs 5.3, 9.2.)

vii.     On or about March 11, 1998, Lankford executed a "Mid-America Foundation Gift Annuity Agent Compensation Agreement" wherein he agreed to act as an agent of MAF.  (*See,* attached exhibit 3 to *Lankford Deposition Transcript* at 66:13-22 marked as Exhibit 73.)

viii.     In exchange for selling MAF CGAs, Lankford was to be paid a 6 to 8 percent commission based upon the face amount of MAF CGAs sold by him. (*See,* attached exhibit 3 to *Lankford Deposition Transcript* marked as Exhibit 73.)

**Guttilla & Murphy, PC**
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

34

1          ix.     Defendant Lankford testified that he was paid an 8%

2    commission on the sale of MAF CGAs.  (*See,* attached *Lankford Deposition Transcript* at

3    172:3-12 marked as Exhibit 73.)

4          x.      On or about March 13, 1998, Lankford executed a

5    "Marketing and Sales Agreement" between himself, Mid-America Estate Planning, Inc.,

6    and MAFG.  (*See,* attached exhibit 4 to *Lankford Deposition Transcript* marked as

7    Exhibit 73.)

8          xi.     Defendant Lankford acknowledged in the "Marketing and

9    Sales Agreement" that he was the sole shareholder of Mid-America Estate Services, LLC

10   and was responsible for the debts and liabilities of Mid-America Estate Services. (*See,*

11   exhibit 4 to *Lankford Deposition Transcript,* page 4, marked as Exhibit 73.)

12         xii.    The agreement provided for Defendant Lankford as General

13   Agent of MAFG to market and sell all MAFG products.  The agreement further provided

14   for the following:

15       Within ninety (90) days of the execution of this Agreement, Dwight
         Lankford shall produce fifteen (15) Revocable Living Trusts per
16       week.  Within ninety (90) days of the execution of this Agreement,
         Dwight Lankford shall produce Five Hundred Thousand Dollars
17       ($500,000.00) annuity premium, life insurance premium, and/or gift
         annuity premium per week. Within one hundred eighty days (180)
18       days of the execution of this Agreement, Dwight Lankford shall
         produce One Million Dollars ($1,000,000.00) of annuity premium, life
19       insurance premium and/or gift annuity premium per week.

20   (*See,* attached exhibit 4 to *Lankford Deposition Transcript*, section 6, marked as

21   Exhibit 73.)

22         xiii.   In exchange for Lankford's sales, Lankford was to receive a

23   commission based upon the sales of MAF CGAs plus "performance bonuses" once his

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

1   total amount of business written by him or his agents exceeded $1,750,000.00 plus he

2   would be paid expenses of $1,500.00 per week contingent upon his performance of

3   production requirements.  (*See,* attached exhibit 4 to *Lankford Deposition Transcript,*

4   sections 6, 7, 9, marked as Exhibit 73.)

5                    xiv.    The following MAF CGAs were sold by Defendant Lankford

6   in Texas:

| CGA No. | CGA Application Date | Issuance Date | Names of Purchasers | Commission Paid |
|---------|----------------------|---------------|---------------------|-----------------|
| 1.  20513 | 2-19-98 | 2-27-98 | E. Orr | $ 30,601.36 |
| 2.  20519 | 3-1-98 | 3-05-98 | C. Polk | $ 8,000.00 |
| 3. 20520 | 3-1-98 | 3-5-98 | C. Polk | $ 8,000.00 |
| 4.  20521 | 2-26-98 | 3-12-98 | M. Kuehne | $ 4,500.00 |
| 5. 20531 | 4-03-98 | 5-3-98 | C. Thiebeault III | $ 2,552.16 |
| 6. 20534 | 4-10-98 | 4-15-98 | B. Wade | $ 6,000.00 |
| 7. 20535 | 4-10-98 | 4-15-98 | B. Wade | $ 6,000.00 |
| 8. 20536 | 4-10-98 | 6-03-98 | B. Wade | $ 6,000.00 |
| 9. 20587 | 8-22-98 | 9-24-98 | V. Cox | $ 12,575.90 |
| 10.  20601 | 9-21-98 | 10-9-98 | J & S. Tullis | $ 2,000.00 |
| 11. 20614 | 10-02-98 | 9-24-98 | V. Cox. | $ 12,575.90 |
| 12. 20619 | 10-1-98 | 10-30-98 | C. & O. Griffith | $ 5,200.00 |
| 13. 20621 | 10-20-98 | 11-13-98 | J. Fuller | $ 25,275.05 |
| 14. 20656 | 12-15-98 | 1-22-99 | N. Shaw | $ 8,880.00 |
| 15. 20657 | 12-15-98 | 1-15-99 | N. Shaw | $ 23,651.34 |

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

| | | | | | |
|---|---|---|---|---|---|
| 1 | 16. 20658 | 12-15-98 | 1-22-99 | N. Shaw | $ 8,000.00 |
| 2 | 17. 20682 | 2-16-99 | 6-15-99 | O. Thrash | $ 8,958.66 |
| 3 | 18. 20695 | 3-29-99 | 3-31-99 | L. & H. Menius | $ 22,660.00 |
| 4 | 19. 20706 | 5-07-99 | 5-13-99 | C. & M. Welch | $ 8,200.00 |
| 5 | 20. 20707 | 5-12-99 | 6-16-99 | R. & P. Green | $ 19,931.24 |
| 6 | 21. 20708 | 5-11-99 | 5-25-99 | J. Sheridan | $ 1,967.34 |
| 7 | 22. 20709 | 5-11-99 | 5-25-99 | J. Sheridan | $ 1,967.34 |
| 8 | 23. 20710 | 5-11-99 | 5-25-99 | J. Sheridan | $ 1,967.34 |
| 9 | 24. 20711 | 5-11-99 | 5-25-99 | J. Sheridan | $ 1,967.34 |
| 10 | 25. 20712 | 5-11-99 | 5-25-99 | J. Sheridan | $ 1,967.34 |
| 11 | 26. 20713 | 5-13-99 | 6-18-99 | R. Lee | $ 23,681.10 |
| 12 | 27. 20717 | 5-07-99 | 6-1-99 | C. & M. Welch | $ 30,474.57 |
| 13 | 28. 20757 | 9-01-99 | 9-23-99 | W. Vice | $ 5,120.00 |
| 14 | 29. 20760 | 9-23-99 | 11-2-99 | R. & S. DeDoes | $120,093.84 |
| 15 | 30. 20772 | 10-11-99 | 10-31-00 | J & H. Altizer | $ 3,829.39 |
| 16 | 31. 20922 | 5-30-01 | 6-25-01 | A. Drake | $ 33,511.10 |
| 17 | **Total:** | | | | **$456,108.31** |
| 18 | <u>CGA No.</u> | <u>Approximate age(s) of purchaser(s) at time of CGA Application</u> | | | |
| 19 | 1. 20513 | 71 | | | |
| 20 | 2. 20519 | 88 | | | |
| 21 | 3. 20520 | 88 | | | |
| 22 | 4. 20521 | 62 | | | |
| 23 | 5. 20531 | 80 | | | |

| | | |
|---|---|---|
| 1 | 6. 20534 | 67 |
| 2 | 7. 20535 | 67 |
| 3 | 8. 20536 | 67 |
| 4 | 9. 20587 | 79 |
| 5 | 10. 20601 | 71; 73 |
| 6 | 11.20614 | 79 |
| 7 | 12. 20619 | 76; 75 |
| 8 | 13. 20621 | 85 |
| 9 | 14. 20656 | 88 |
| 10 | 15. 20657 | 88 |
| 11 | 16. 20658 | 88 |
| 12 | 17. 20682 | 70 |
| 13 | 18. 20695 | 80; 79 |
| 14 | 19.  20706 | 66; 60 |
| 15 | 20. 20707 | 73; 73 |
| 16 | 21.  20708 | 84 |
| 17 | 22.  20709 | 84 |
| 18 | 23. 20710 | 84 |
| 19 | 24.20711 | 84 |
| 20 | 25. 20712 | 84 |
| 21 | 26. 20713 | 52 |
| 22 | 27.  20717 | 66; 60 |
| 23 | 28.  20757 | 72 |

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

38

1   29. 20760    64; 62

2   30. 20772    72; 78

3   31. 20922    89

4   *(See,* attached *copies of CGA Applications, CGAs, and evidence of payment of*

5   *commissions related thereto* marked as Exhibits 74 through 104.)

6           xv.    Defendant Lankford admits receiving $421,609.63 in commissions

7   on sales of MAF CGAs.  (*See* attached *Lankford Response to Receiver's Interrogatory*

8   *No. 10* marked as Exhibit 72; *Rada Defendants Amended Response to Receiver's Request*

9   *to Admit No. 2* marked as Exhibit 20.)  Lankford agreed that he received all commissions

10  identified *supra,* with the exception of CGAs 20656, 20657 and 20712 which Lankford

11  failed to address in his Response to Receiver's Interrogatory No. 10.  (See, attached

12  Lankford Response to Receiver's Interrogatory No. 10 marked as Exhibit 72; *Rada*

13  *Defendants' Amended Response to Request for Admissions No. 2* marked as Exhibit 20.)

14      **b.    Defendant Lankford explains why it is essential to have an audited**

15  **financial statement:**

16          i.    Defendant Lankford testified that he "wanted to see audited

17  financial statements that would show . . . [him] that . . . [his] clients' money was safe."

18  An audited financial statement would have shown "[w]ell, it would have come from an

19  auditing group whether KPMG or any of the other big ones.  And it would have shown

20  me the audited returns, the physical returns audited and certified by that accounting

21  group.  So . . . [he] would know what they were—what their financial position was."

22  (*See,* attached *Lankford Deposition Transcript* at, 123:4-13, marked as Exhibit 73.)

23

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

ii.     Defendant Lankford testified that without an audited statement there was no one who could confirm the numbers of dollars MAF stated it had in reserves to cover its charitable gift annuity obligations.  Defendant Lankford testified, "That's why I was screaming for an audited financial statement."  (*See* attached *Lankford Deposition Transcript* at 135:18-25; 136:1-11, marked as Exhibit 73.)

c.     **Defendant Lankford discusses the many times he demanded an audited financial statement—and the fact that he never received one:**

i.     As earlier set forth, *supra,* Defendant Lankford received commissions for MAF CGAs sold between February of 1998 and October of 1999 and one in 2000 (CGA No. 20772) and one in 2001 (CGA No. 20922).  (*See,*15. a. xiv., *supra.)*

ii.     Defendant Lankford admitted that prior to his sale of MAF CGAs, he did not possess an audited financial statement for MAF or MAFG prepared by a certified public accountant who acted independently of MAF or MAFG.  (*See,* attached *Lankford Response to Receiver's Request to Admit No. 24* marked as Exhibit 105.)

iii.     Defendant Lankford testified that toward the end of 1998, he requested an audited financial statement of MAF but he never received one.  (*See,* attached *Lankford Deposition Transcript* at 131: 11-16 marked as Exhibit 73.)

iv.     Defendant Lankford also stated the following:

Defendant requested an audited financial statement from Robert Dillie, Felicia Majewski, Herschel Gulley, Nelson Happy, Bo Diaz and Michael Maksudian.  Received a Financial Statement dated 10/1/01.  See BMB 1773-1776.

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

40

1    (*See,* attached *Lankford Response to Receiver's Interrogatory No. 29* marked as

2    Exhibit 72.)

3         v.    At his deposition, Defendant Lankford testified that the

4    financial statement he referenced in his response to Receiver's Interrogatory No. 29 was

5    *not* audited.  (*See*, attached *Lankford Deposition Transcript* at 162:7-24; 164:4-8 marked

6    as Exhibit 73.)

7         vi.    Defendant Lankford testified that after he stopped selling

8    MAF CGAs in 1999 (with the exception of two MAF CGAs sold after 1999), he was

9    "very adamant that . . . [he] wanted to see audited financial statements because 18 months

10   had gone by and I hadn't seen any." (*See,* attached *Lankford Deposition Transcript* at

11   103:24-25; 104:1-15 marked as Exhibit 73.)

12        vii.    Defendant Lankford testified under oath that in 1999, after

13   the MAF CGAs for which he was paid a commission had been sold, (excepting CGA

14   Nos. 20772 and 20922,) he gave an "ultimatum, that if . . . [he] didn't have [Mid-America

15   Foundation] audited financial statements by that time, [he] would start whatever

16   proceedings that . . . [he] had to, to get this in front of the regulators."  (*See,* attached

17   *Lankford Deposition Transcript* at 121:1-25; 122:11-18 marked as Exhibit 73.)

18        viii.    After Lankford threatened to take the matter to the

19   "regulators" if he didn't receive an MAF audited financial statement in 2000, he sold

20   **another** MAF CGA in 2000 and another in 2001 despite the undisputed fact that he still

21   had not received an audited financial statement. (See, 15. a. xiv. *supra*, regarding CGA

22   No. 20772 and 20922.)

23

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

ix.     Defendant Lankford testified that many times he requested audited financial statements and IRS Form 990s for MAF before a meeting he had in June 2000 but was never provided with any such documents.  (*See,* attached *Lankford Deposition Transcript* at 124:12:25; 125:1-16; 127:13-18 marked as Exhibit 73.)

x.     Defendant Lankford testified that he never saw an audited financial statement for Mid-America Foundation, Inc. (*See* attached *Lankford Deposition Transcript* at 123:15-25; 124:1 marked as Exhibit 73.)

**16.     MAF failed to provide notice to the Texas Department of Insurance of information relating to its sale of CGAs.**

a.     MAF was not authorized to sell insurance in Texas and MAF failed to provide notice to the Texas Department of Insurance of its non-profit and tax exempt status or any other information relating to the sale of CGAs in Texas.  (*See*, attached *Official Negative Certification* marked as Exhibit 106.)

**17.     Charitable gift annuities sold in Arizona.**

**a.     Defendant Leonard Bestgen**

i.     Defendant Bestgen stated that he held a license from the Arizona Department of Insurance from 1991 to the present. (*See,* attached *Bestgen Response to Receiver's Interrogatory No. 22* marked as Exhibit 107.)

ii.     On or about April 14, 1998, Defendant Bestgen agreed to act as an agent for Mid-America Foundation, Inc., in the sale of MAF CGAs.  (*See,* attached *Mid-America Foundation Gift Annuity Agent Compensation Agreement Stock Option Program* dated April 14, 1998 marked as Exhibit 108; *Mid-America Foundation, Inc., Stock Option Program Confidentiality Agreement* marked as Exhibit 109.)

iii.	On October 6, 1998, Defendant Bestgen entered into another agreement with MAF. Again, Defendant Bestgen acknowledged that he was an agent of MAF. (*See,* attached *Mid-America Foundation Gift Annuity Agent Compensation Agreement, General Provisions, 1* marked as Exhibit 108.)  Under this agreement, Defendant Bestgen would be paid an 8% commission on the face amount of MAF CGAs for "Immediate Charitable Gift annuity Commission" and 10% of the fact amount of the MAF CGA for deferred CGAs. (Addendum A.)  (*See,* attached *Mid-America Foundation Gift Annuity Agent Compensation Agreement* marked as Exhibit 108.)

iv.	The following are MAF CGAs sold by Defendant Bestgen in Arizona:

| CGA No. | CGA Application Date | Issuance Date | Names of Purchasers | Commission Paid |
|---------|--------------------|---------------|---------------------|-----------------|
| 20548 | 5-1-98 | 5-20-98 | I. Meyers | $  4,044.90 |
| 20610 | 10-1-98 | 10-2-98 | E. Bright | $ 11,871.19 |
| 20611 | 10-1-98 | 10-16-98 | E. Bright | $  4,330.42 |
| 20612 | 10-1-98 | 10-8-98 | G. & D. Bright | $ 14,041.09 |
| 20618 | 10-1-98 | 10-21-98 | G.& D. Bright | $  5,960.72 |
| 20645 | 12-2-98 | not known | H. Fetzer | $ 16,000.00 |
| 20646 | 12-2-98 | 12-9-98 | H. Fetzer | $ 16,000.00 |
| 20647 | 12-2-98 | 12-9-98 | H. Fetzer | $ 16,000.00 |

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

43

**Guttilla & Murphy, PC**
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

| | | | | |
|---|---|---|---|---|
| 20648 | 12-2-98 | 12-9-98 | H. & . C. Fetzer | $ 16,000.00[2] |

**Total:** $104,248.32

| CGA No. | Approximate age(s) of purchaser(s) at time of CGA Application |
|---|---|
| 20548 | 76 |
| 20610 | 87 |
| 20611 | 87 |
| 20612 | 59; 58 |
| 20618 | 59;58 |
| 20645 | 73 |
| 20646 | 73 |
| 20647 | 73 |
| 20648 | 73; 75 |

(*See,* attached *copies of CGA applications, CGAs, and evidence of payment of commissions related thereto* marked as Exhibits 110 through 118.)

        v.    **Defendant Bestgen admits receiving $104,248.32 in commission payments.**  (*See* attached *Response to Receiver's Interrogatory No. 10* marked as Exhibit 107; *Rada Defendants Response to Receiver's Request to Admit No. 2* marked as Exhibit 20.)

        vi.    Defendant Bestgen admits that prior to his sale of MAF CGAs, he did not possess an audited financial statement for Mid-America Foundation or MAFG prepared by a certified public accountant who acted independently of MAF or

---

[2] The $16,000.00 sum is taken from Defendant Bestgen's Response to Receiver's Interrogatory Request no. 10.  (*See,* attached *Bestgen Response to Receiver's Interrogatory no. 10 marked as Exhibit 107.*)

44

1    MAFG or persons/entities related to those entities.  (*See,* attached *Response to Receiver's*

2    *Request for Admission No. 24* marked as Exhibit 119; *Response to Receiver's Second*

3    *Discovery Request to Admit No. 34* marked as Exhibit 120.)  Significantly, Defendant

4    Bestgen stated that he requested an audited financial statement for MAF or MAFG

5    (although he does not provide a date) and implied that Dillie had promised to provide him

6    with one as of December 31, 1998.  (*See,* attached *Bestgen Response to Interrogatory No.*

7    *29* marked as Exhibit 107.)  As set forth earlier, he sold the MAF CGAs prior to that date.

8         **b**.    **Rudy Crosswell**

9              i.    Defendant Crosswell stated that he held an insurance license

10   from the State of Arizona from 1983 to the present.  He had two NASD securities

11   licenses, series 6 and 63 from 1983 to 1993.  Accordingly, his securities license had long

12   since expired when he sold the MAF CGAs. (*See,* attached *Crosswell Response to*

13   *Receiver's Interrogatory No. 22* marked as Exhibit 121.)

14              ii.    Defendant Crosswell admitted that after attending a Mid-

15   America seminar he became an agent of MAF in approximately March of 1998.  (*See,*

16   attached *Crosswell Deposition Transcript* at 84:6-25; 85:1-25; 86:1-12; 89:1-25; 90:1-9

17   marked as Exhibit 122.)

18              iii.    Defendant Crosswell testified that he received 10%

19   commissions on the White and Campbell MAF CGAs and 8% on the Berg MAF CGA.

20   (*See* attached *Crosswell Deposition Transcript* at 59: 8-25; 60:1-25; 61:1-24 marked as

21   Exhibit 122.)

22              iv.    Defendant Crosswell sold the following MAF CGAs in

23   Arizona:

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

45

| CGA No. | CGA Application Date | Issuance Date | Names of Purchasers | Commission Paid |
|---------|---------------------|---------------|---------------------|-----------------|
| 20558 | 6-10-98 | 7-16-98 | M. Campbell | $ 24,000.00 |
| 20565 | 6-10-98 | 7-16-98 | M. Berg | $ 12,000.00 |
| 20675 | 2-9-99 | 2-9-99 | C. White, Jr. | $ 35,137.91 |
| **Total:** | | | | **$ 71,137.91** |

| CGA No. | Approximate age(s) of purchaser(s) at time of CGA Application |
|---------|--------------------------------------------------------------|
| 20558 | 96 |
| 20565 75 | 92 |

*(See,* attached *copies of CGA applications, CGAs, and evidence of payment of commissions related thereto* marked as Exhibits 123 through 125.)

> v. **Defendant Crosswell admits that he received $71,137.91 in commissions on the sale of MAF CGAs as summarized,** *supra*. (*See,* attached *Crosswell Response to Receiver's Interrogatory No. 10* marked as Exhibit 121; *Rada Defendants' Amended Response to Request for Admissions No. 2* marked as Exhibit 20.)

> vi. In response to Interrogatory No. 27 asking Defendants to identify all steps that had been taken to verify the licensing history (insurance, securities, etc.) of Robert Dillie or any other Board Members of MAF prior to the Defendants' sales of MAF CGAs, Defendant Crosswell answered: None. (*See* attached *Crosswell Response to Receiver's Interrogatory No. 27* marked as Exhibit 121; Crosswell *Response to Receiver's Interrogatory No. 8* marked as Exhibit 121.)

> vii. Defendant Crosswell admitted that prior to his sale of MAF CGAs that he did not possess an audited financial statement for MAF or MAFG prepared

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

by a certified public accountant who acted independently of MAF or MAFG or persons/entities related to these entities.  (*See,* attached *Crosswell Admission to Request to Admit No. 24* marked as Exhibit 126.)

viii.    Defendant Crosswell admitted that he took no steps to investigate the financial solvency of MAF.  (*See*, attached *Crosswell Response to Receiver's Interrogatory No. 21* marked as Exhibit 121.)

ix.    Defendant Crosswell admits that he did nothing to investigate the financial structure and operation of MAF or MAFG through sources independent of MAF or MAFG.  (*See,* attached *Crosswell Response to Receiver's Second Discovery Request, Interrogatory No. 33* marked as Exhibit 127.)

x.    Defendant Crosswell admits that he did not make any determination to see if MAF could meet its annuity obligations to his clients.  (*See*, attached *Crosswell Deposition Transcript* at 114:2-5 marked as Exhibit 122.)

xi.    Defendant Crosswell admits that he did not independently contact any of the charities listed in the MAF marketing materials.  (*See*, attached *Crosswell Deposition Transcript* at 115:5-19 marked as Exhibit 122.)

xii.    Defendant Crosswell admits that he did not ask for a copy of MAF's 990 tax return forms. (*See*, attached *Crosswell Deposition Transcript* at 118:23-25 marked as Exhibit 122.)

xiii.    Defendant Crosswell admits that in 1998 he was sued by the Securities and Exchange Commission in 1998 and on July 27, 1998 he settled with the SEC agreeing that he would no longer sell any securities.  (*See*, attached *Crosswell Deposition Transcript* at 32:21-25; 33:1-3; 122:5-11 marked as Exhibit 122.)

47

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

ix.   In an action brought by the Securities and Exchange Commission *In the Matter of Rudy Croswell and Paula G. Den Boer,* Administrative Proceeding File No.3-9656, dated July 27, 1998, it was ordered (based upon the terms of a settlement agreement between Defendant Croswell and the SEC) that Defendant Croswell was suspended from association with any broker or dealer for a period of twelve months. The basis of the SEC's complaint against Defendant Croswell was the selling of limited partnership units or notes (securities) that had not been registered with the SEC and that the issuer of the securities had not been properly registered as a broker-dealer. (*See* attached SEC Order in *In the Matter of Rudy Crosswell et al.,* File no. 3-9656 marked as Exhibit 128; *see,* attached *Crosswell Deposition Transcript* at 122:4-11 marked as Exhibit 122).

c.   **John Rada**

i.   Defendant Rada stated that he held an Arizona insurance license from 1989 to the present.  (*See,* attached *Rada Response to Receiver's Interrogatory No. 22* marked as Exhibit 129.)

ii.   In his "Associate Personal Information" form dated March 24, 1999, Defendant Rada indicated that his primary market was "Long Term Care," "Annuities," and "Charitable Giving." (*See,* attached page 1 of exhibit 3 to *Rada Deposition Transcript,* 19:6-22 marked as Exhibit 132.)

iii.   On or about March 24, 1999, Defendant Rada executed a Mid-America Independent Associate Agreement in which Mid-America Estate Planning, Inc., and MAFG agreed to provide Rada training, marketing materials and support for estate planning and the solicitation of CGA sales and Rada would be paid a commission

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

for the sale of any Mid-America Estate Planning and MAFG products. (*See* attached

*Rada Deposition Transcript* 19-23:1-4 and exhibit 3 marked as Exhibit 132.)

        iv.     On July 19, 1999, Defendant Rada dba LTC Insurance

Services, Inc., executed a "Charitable Gift Annuity 'General Agent' Representation

Agreement" wherein Rada was appointed as an authorized agent of MAF to sell its CGAs

(*see*, attached exhibit 2 to *Rada Deposition Transcript, Charitable Gift Annuity 'General

Agent' Representation Agreement, 1,* 17:1-12, marked as Exhibit 132)  In exchange,

Defendant Rada would be paid compensation "in the amount of (7%) of the gross value

of the assets transferred to fund each charitable gift annuity" plus a bonus where sales

grossed $1.2 million or more (¶6 of the Agreement) and MAF could terminate the

agreement if Defendant Rada failed to produce $500,000.00 of CGAs premium "on a

rolling twelve (12) month basis during the term of" the Agreement. (¶8 of the

Agreement.)  (*See,* attached exhibit 2 to *Rada Deposition Transcript* marked as Exhibit

132.)

        v.     LTC Insurance Services was Defendant Rada's solely owned

corporation.  (*See* attached *Rada Deposition Transcript* at 43:18-25 marked as Exhibit

132.)

        vi.    Defendant Rada sold the following MAF CGAs in Arizona:

| CGA No. | CGA Application Date | Issuance Date | Names of Purchasers | Commission Paid |
|---------|---------------------|---------------|---------------------|-----------------|
| 20732 | 7-28-99 | 8-9-99 | M. Scheller | $ 20,216.22 |
| 20714 | 5-20-99 | 5-20-99 | M. Scheller | $ 18,894.79 |
| **Total:** | | | | **$ 39,111.01** |

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

CGA No.     Approximate age(s) of purchaser(s) at time of CGA Application

20732          65

20714          65

*(See,* attached *copies of CGA applications, CGAs, and evidence of payment of commissions related thereto* marked as Exhibits 130 through 131.)

    vii. **Defendant Rada admitted receiving $39,111.01 in commissions on the sales of MAF CGAs.** (*See,* attached *Rada Response to Receiver's Interrogatory No.10* marked as Exhibit 129; *Rada Response to Receiver's Request to Admit No. 2* marked as Exhibit 20.)

    viii. The only information Defendant Rada sought or obtained from sources other than Robert Dillie or other representatives of MAF or MAFG regarding MAF or MAFG was the Arizona Corporation Commission which "confirmed Mid-America is 501(c)(3) charity" and the Arizona Department of Insurance which "confirmed that CGAs are not insurance product."  (*See* attached *Rada Response to Receiver's Interrogatory No. 8* marked as Exhibit 129.)

    ix. The only steps Defendant Rada took to investigate the financial solvency of MAF was to obtain information from MAF itself; saw an advertisement with a "CPA endorsement" in a magazine or newspaper; and called the Arizona Department of Insurance and was told it was "[n]ot insurance; no complaints on Mid-America." These steps were taken in 1999.  (*See* attached *Rada Response to Receiver's Interrogatory No. 21* marked as Exhibit 129.)

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

**Guttilla & Murphy, PC**
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

x.     Defendant Rada testified that he took no steps to investigate MAF's financial solvency before he sold two MAF CGAS. (*See,* attached *Rada Deposition Transcript* 83:7-16, 22-25, 84:1 marked as Exhibit 132.)

xi.     Defendant Rada admitted that he took no steps directly or indirectly to verify the licensing history of Robert Dillie or any other Board Member of MAF prior to his sale of MAF CGAs. (*See,* attached *Rada Response to Receiver's Interrogatory No. 27* marked as Exhibit 129.)

xii.     Defendant Rada admitted that he did not request or possess a financial statement for MAF or MAFG prepared by an independent certified public accountant prior to his sale of MAF CGAs.  (*See,* attached *Rada Response to Receiver's Interrogatory No. 29* marked as Exhibit 129; *Rada Response to Receiver's Request to Admit No. 24* marked as Exhibit 133.)

xiii.     When asked why he didn't request to review an audited or unaudited MAF financial statement, Defendant Rada answered: "I wouldn't have been able to understand or comprehend an audited financial statement or a nonaudited financial statement."  (*See*, attached *Rada Deposition Transcript* 100:20-25; 101:1-2 marked as Exhibit 132.)

xiv.     Defendant Rada admitted that he did not review any Form 990 tax returns for MAF.  (*See,* attached *Rada Deposition Transcript* at 76:1-12 marked as Exhibit 132.)

xv.     Defendant Rada testified that some of the MAF brochures and information that he gave to Ms. Scheller contained information regarding Merrill Lynch,

1   yet he did not confirm any of the information with respect to Merrill Lynch given by

2   MAF.  (*See* attached *Rada Deposition Transcript* 92:8-23 marked as Exhibit 132.)

3                        xvi.      Defendant Rada testified that he did not contact any of the

4   charitable organizations listed in the MAF marketing materials. (*See,* attached *Rada*

5   *Deposition Transcript* 110:15-25; 111:1-5 marked as Exhibit 132.)

6         **d**.      **Patrick Wehrly**

7                        **i.**      Defendant Wehrly stated that he has an insurance license in

8   good standing in Arizona and Texas.  (*See,* attached *Wehrly Response to Receiver's*

9   *Interrogatory No. 22* marked as Exhibit 134.)  Defendant Wehrly did not receive an

10  insurance license from the Arizona Department of Insurance until approximately six

11  years after he sold the MAF CGAs.  (*See* attached *certified copy of licensing record of*

12  *Patrick Wehrly showing issuance of insurance license in March of 2004* marked as

13  Exhibit 135.)

14                       ii.      On January 31, 1998, Defendant Patrick Wehrly executed a

15  "Seminar Agreement" with Mid-America Estate Planning, Inc., "Mid-America" and

16  MAFG wherein Wehrly agreed to perform seminar presentations for Mid-America in

17  exchange for $750 per seminar.  (*See*, attached *Seminar Agreement* marked as Exhibit

18  136.)

19                       iii.      On February 10, 1998, Defendant Wehrly executed a

20  "Marketing and Sales Agreement" with Mid-America wherein Wehrly agreed to market

21  and sell Mid-America products in exchange for the payment of commissions.  (*See,*

22  attached exhibit 4 to *Wehrly Deposition Transcript,* 45:1-25, 46:1-8, marked as Exhibit

23  137.)

**Guttilla & Murphy, PC**
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

iv.      The commission checks paid on CGA policies 20544, 20545, 20548 and 20566, were made payable to Southwest Estate Planners.  (*See,* attached *financial information* marked as Exhibits 138, 139, 140, 141.)  Defendant Wehrly testified at his deposition that he and his wife were the sole shareholders of Southwest Estate Planners. (*See,* attached *Wehrly Deposition Transcript* at 21:23-25; 22:1-4; 29:19-24 marked as Exhibit 137.)

v.      Defendant Wehrly sold five MAF CGAs in Arizona, as follows:

| CGA No. | CGA Application Date | Issuance Date | Names of Purchasers | Commission Paid |
|---------|---------------------|---------------|---------------------|-----------------|
| 20544 | 5-5-98 | 5-27-98 | D. Culloton | $ 20,000.00 |
| 20545 | 5-5-98 | 6-15-98 | D. Culloton | $ 20,000.00 |
| 20548 | 5-15-98 | 5-20-98 | I. & M. Meyers | $   1,348.30 |
| 20566 | 6-15-98 | 7-13-98 | L. Sweeny | $ 17,298.33 |
| 20594 | 9-7-98 | 10-20-98 | E. Plasman | $ 12,459.48 |
| **Total:** | | | | **$ 71,106.11** |

| CGA No. | Approximate age(s) of purchaser(s) at time of CGA Application |
|---------|---------------------------------------------------------------|
| 20545 | 74 |
| 20544 | 74 |
| 20548 | 76; 74 |
| 20566 | 86 |
| 20594 | 83 |

1   *(See,* attached *copies of CGA applications, CGAs, and evidence of payment of*

2   *commissions related thereto* marked as Exhibits 138-142; Defendant Wehrly originally

3   claimed his commissions on CGA No. 20544 were only $15,000 each; however, at his

4   deposition he admitted receiving $20,000 in commission payment for each of the

5   Culloton MAF CGAs for a total of $40,000 in commission for the sale of the two MAF

6   CGAs. *(See,* attached *Wehrly Deposition Transcript* at 85:21-25; 86:1-25; 87:1-25; 88:1-

7   16 marked as Exhibit 137.)  Wehrly admitted that his commission on CGA No. 20594

8   was $12,459.88.  Wehrly stated that he could not recall his commission on CGA No.

9   20566; however, at his deposition he admitted receiving $17,298.33 as a commission for

10  the sale of a MAF CGA to Ms. Sweeny.  *(See,* attached *Wehrly Deposition Transcript* at

11  91:4-25; 92:1-3 marked as Exhibit 137.)  Wehrly admitted that he received $42,459.88 in

12  commissions for his sale of MAF CGAs.  *(See,* attached *Wehrly Response to Receiver's*

13  *Interrogatory No. 10* marked as Exhibit 134; Defendant *Rada's Response to Receiver's*

14  *Request to Admit No. 2,* marked as Exhibit 20.)  **Wehrly admitted at his deposition**

15  **that he received $71,106.51 in commission for the sale of the five MAF CGAs**

16  **identified above.**  *(See,* attached *Wehrly Deposition Transcript* at 94:16-25; 95:1-4.

17  marked as Exhibit 137.)

18                   vii.     Defendant Wehrly testified that he told his clients that Merrill

19  Lynch and Mutual of Omaha were two companies that were going to hold MAF's assets

20  and ensure the safety of the assets.  *(See,* attached *Wehrly Deposition Transcript* at

21  135:18-25; 136:1-9 marked as Exhibit 137.)

22                   viii.    Defendant Wehrly did not take any steps to independently

23  verify information in a Mid-America brochure regarding any relationship with Merrill

1    Lynch or United of Omaha. (*See,* attached *Wehrly Deposition Transcript* 73:14-25; 74:1-

2    7; 75:15-25; 76:1-23; 136: 11-15 marked as Exhibit 137.)

3              ix.    Defendant Wehrly admitted that prior to his sale of MAF

4    CGAs he did not seek information independent of people associated with MAF in order

5    to confirm that MAF was solvent and had sufficient assets to fulfill their CGA

6    obligations.  (See attached Wehrly deposition transcript 133:3-25; 134:1-25; 135:1-13

7    marked as Exhibit 137.)

8              x.    The only information that could arguably be categorized as

9    financial information about MAF seen by Defendant Wehrly was found in the MAF

10   marketing brochures.  (*See,* attached *Wehrly Deposition Transcript* at 117:21-25; 118:1-4

11   marked as Exhibit 137.)  Defendant Wehrly testified that he never reviewed any financial

12   documents with respect to MAF.  (*See,* attached *Wehrly Deposition Transcript* at 118:18-

13   25; 119:1-25; 120:1-25; 121:1-14 marked as Exhibit 137.)

14             xi.    When asked if he had ever requested a financial statement for

15   MAF or MAFG prepared by an independent certified public accountant, Defendant

16   Wehrly admitted that he did not receive an audited financial statement. (*See,* attached

17   *Wehrly Response to Receiver's Interrogatory No. 29* marked as Exhibit 134; *Wehrly*

18   *Response to Receiver's Second Discovery Request, Interrogatory No. 32* marked as

19   Exhibit 143; *Wehrly Response to Receiver's Request to Admit No. 24* marked as Exhibit

20   144.)

21             xii.   Defendant Wehrly never asked MAF to put him in contact

22   with a charity that had received some money from the residual of a CGA.  (*See,* attached

23   *Wehrly Deposition Transcript* at 123:10-13 marked as Exhibit 137.)

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

**Guttilla & Murphy, PC**
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

xiii.    Defendant Wehrly testified that he never asked MAF for any 990 tax returns for MAF. (*See,* attached *Wehrly Deposition Transcript* at 130:14-24 marked as Exhibit 137.)

**18.    Charitable gift annuities sold in Massachusetts**

**a.    Charles Davis**

i.    Charles Davis stated that he held an insurance license from the state of Massachusetts from 12/90 to the present.  He states that he also held a series 6 and series 63 securities licenses from the NASD from 6/98-12/98.  (*See*, attached *Davis Response to Receiver's Interrogatory No. 22* marked as Exhibit 145.)

ii.    Davis was never licensed to sell securities by the Securities Division of the Commonwealth of Massachusetts. (*See,* attached *certified statement advising of lack of licensure* marked as Exhibit 146.)  (Also, Charles Davis was never licensed to offer or sell securities by the Department of Professional and Financial Regulations, Office of Securities for the State of Maine.  [See attached *certified statement from the Department of Professional and Financial Regulations, Office of Securities for the State of Maine* marked as Exhibit 147.]  His commissions on the Theimann MAF CGAs were based upon the sales of CGAs sold in Maine by Defendant Paul Richard. (*See,* attached pay transmittals and ledgers in Exhibits 153 through 161.))

iii.    Defendant Davis executed a "Marketing and Sales Agreement" with Mid-America Estate Planning and MAFG on or about February 16, 1998.  (*See,* attached *Marketing and Sales Agreement* marked as Exhibit 2 to Davis Deposition Transcript; 35:15-25; 36:1-25 marked as Exhibit 148.)

56

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

iv.     In the Marketing and Sales Agreement, Davis agreed that within ninety (90) days of the execution of the agreement, he and Peter Morris would produce fifteen (15) Revocable Living Trusts per week, five hundred thousand dollars ($500,000.00) in annuity premium, life insurance premium, and or gift annuity premium per week and, within 180 days of the execution of the agreement, he and Morris would produce one million dollars ($1,000,000.00) of annuity premium, life insurance premium and or gift annuity premium per week.  (*See,* attached Exhibit 2 to Davis Deposition Transcript, ¶7 marked as Exhibit 148.)

v.     Defendant Davis sold the following MAF CGAs in Massachusetts:

| CGA No. | CGA Application Date | Issuance Date | Names of Purchasers | Commission Paid |
|---------|---------------------|---------------|---------------------|-----------------|
| 20538 | 4-17-98 | 4-20-98 | N. McNutt | $    837.30[3] |
| 20624 | not known | 11-4-98 | M. Lavigne | $  4,605.92 |
| 20664 | not known | 1-29-99 | G. & B. White | $ 13,877.33 |
| 20666 | not known | 3-5-99 | G. & B. White | $  3,403.81 |
| 20735 | 8-4-99 | 8-23-99 | S. Theimann, Jr. | $  6,035.84 |
| 20745 | 8-11-99 | 8-30-99 | S. Theimann, Jr. | $  5,560.18 |
| 20746 | 8-25-99 | 9-27-99 | S. Theimann, Jr. | $  9,699.06 |
| 20749 | 9-1-99 | 9-27-99 | S. Theimann, Jr. | $  5,309.47 |
| 20764 | 10-6-99 | 11-12-99 | S. Theimann, Jr. | $  5,666.24[4] |

---

[3] Defendant Davis admitted at his deposition that he mistakenly omitted from his Response to Receiver's Interrogatory No.10 that he did, in fact, receive a commission of $837.30 for selling a MAF CGA to Mr. McNutt.  (*See,* attached *Davis Deposition Transcript* 95:6-21 marked as Exhibit 148.)

**Guttilla & Murphy, PC**
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

| 20773 | 10-27-99 | 12-9-99 | S. Theimann, Jr. | $ 12,801.56 |
| 20778 | 12-9-99 | 12-30-99 | S. Theimann, Jr. | $  3,045.98[5] |
| 20804 | 12-27-98 | 1-27-00 | S. Theimann, Jr. | $    580.48 |
| 20807 | 10-6-99 | 12-22-99 | S. Theimann, Jr. | $    374.02 |
| 20812 | 1-14-00 | 2-4-00 | M. Lavigne | $    604.80 |
| 20843 | 5-24-00 | 6-8-00 | N. & L. Fiore | $ 98,711.39 |
| 20845 | commission from this CGA transferred to 20867 & 20868[6] | | | |
| 20867 | 5-31-00 | 6-1-00 | J. LaFond | $ 14,127.13 |
| 20868 | 5-31-00 | 6-1-00 | J. LaFond | $ 14,127.13 |

**Total:**                                                   **$199,367.64**

| CGA No. | Approximate age(s) of purchaser(s) at time of CGA application |
| --- | --- |
| 20538 | 71 |
| 20624 | 80 |
| 20664 | 75; 76 |

---

[4] Defendant asserts that he was paid a commission for one cent less than that identified by the Receiver.  (*See* attached *Davis Response to Receiver's Interrogatory No.* 10 marked as Exhibit 145.)

[5] Defendant claims that the commission paid is three cents less than that identified by the Receiver.  (*See* attached *Davis Response to Receiver's Interrogatory No.* 10 marked as Exhibit 145.)

[6] Originally, Davis sold MAF CGA No. 20845 to Joan LaFond and was paid $28,254.26 in commission on the CGA sale.  Subsequently, Ms. LaFond rescinded this MAF CGA and had it replaced with two new MAF CGAs, i.e., MAF CGA Nos. 20867 and 20868.  The ledger statements then shows that two commissions for $14,127.13 were paid to Defendant Davis for the two CGA replacement policies.  This number multiplied by two equals $28,254.26.  Accordingly, it appears that Davis simply retained his original commission.  (*See*, attached *documents to CGA policy no. 20867* marked as Exhibit 164.)

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

| | |
|---|---|
| 20666 | 75; 76 |
| 20735 | 79 |
| 20745 | 79 |
| 20746 | 79 |
| 20749 | 79 |
| 20746 | 79 |
| 20749 | 79 |
| 20764 | 79 |
| 20773 | 80 |
| 20778 | 80 |
| 20804 | 80 |
| 20807 | 80 |
| 20812 | 81 |
| 20843 | 88; 83 |
| 20867 | 66 |
| 20868 | 66 |

(*See*, attached *CGA applications, policies and related documents* marked as Exhibits 149 through 165; *Davis Deposition Transcript* at 100: 17-25; 101:1-3; 26:5-24 marked as Exhibit 148.)

        vi.     Defendant Davis admits that he was paid $198,743.15 in commission payment for the sale of the MAF CGAs.  He admits that he received all the commissions set forth in ¶17 d. v. *supra.,* (*See*, attached *Davis Response to Receiver's Interrogatory No. 10* marked as Exhibit 145.)

59

**Guttilla & Murphy, PC**
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

vii.     When asked to identify all steps Defendant Davis took to verify the licensing history (insurance, securities, etc.) of Robert Dillie or any other Board member of MAF, prior to the Defendant's sale of MAF CGAs, Defendant Davis answered: None.  (*See,* attached *Davis Response to Receiver's Interrogatory No. 27* marked as Exhibit 145.)

viii.     When asked what he did to investigate MAF before selling a MAF CGA to Ms. Lavigne in 1998, Defendant Davis testified that " . . . Peter Morris did most of the due diligence as far as investigating the company. " (*See,* attached *Davis Deposition Transcript* 62:16-25; 63:1-4 marked as Exhibit 148.)

ix.     Davis also testified that he had no formal business relationship with Peter Morris.  There was no agreement between the two to run a business together.  (*See*, attached *Davis Deposition Transcript* at 86:23-25, 87:1-25; 88:1-1-19 marked as Exhibit 148.)

x.     When asked to identify all steps Defendant undertook to investigate the financial solvency of MAF, Defendant Davis answered: None.  (*See*, attached *Davis Response to Receiver's Interrogatory No. 21* marked as Exhibit 145.)

xi.     Davis testified that he did not believe it was his responsibility to investigate MAF and its finances before he sold any of the MAF CGAs. (*See*, attached *Davis Deposition Transcript* 81:18-20 marked as Exhibit 148.)

xii.     Davis was asked at his deposition how MAF was supposed to have been able to make its income stream payment to his clients. Davis answered:

> "They were going to - - my - - I thought, I assumed that it had the money in an account somewhere that - - or in their general assets that were going to pay these - - these annuitants."

60

1    (*See,* attached *Davis Deposition Transcript* at 79:19-18 marked as Exhibit 148.)

2                    xiii.    When asked whether he simply assumed that in order to pay

3    the annuitants, MAF need to invest its money, Davis answered:

4                    "I assumed that they were in fixed-income obligations.  I don't - -
                     you know, the - - I assumed they were safety - -safe haven-
5                    guaranteed type investments.  I didn't really know how they invested
                     the money."

6    (*See,* attached *Davis Deposition Transcript* 79:19-25 marked as Exhibit 148.)

7                    xiv.    When asked whether Davis had ever requested a financial

8    statement for MAF or MAFG prepared by an independent certified public accountant,

9    Defendant Davis answered: "Defendant requested an audited financial statement.

10   Defendant was given the financial disclosure statement that all donors were to receive by

11   Robert Dillie.  Dates Unknown."  (*See*, attached *Davis Response to Receiver's*

12   *Interrogatory No. 29* marked as Exhibit 145.)

13                   xv.    Defendant Davis admitted that prior to his sale of MAF

14   CGAs that he did not posses an audited financial statement for MAF or MAFG prepared

15   by a certified public accountant who acted independently of MAF or MAFG or persons

16   related to those entities. (See, attached Davis Response to Receiver's Request to Admit

17   no. 24 marked as Exhibit 166.)

18                   xvi.    At his deposition, Davis admitted that he did not request a

19   copy of MAF's tax returns (Form 990s).  (*See*, attached *Davis Deposition Transcript* at

20   70:12-19 marked as Exhibit 148.)

21

22

23

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

61

**19.     The following defendants never requested and/or received MAF or MAFG annual tax forms (990s) filed with the Internal Revenue Service.  No tax returns were ever filed by MAF or MAFG.**

a.     Mid-America Foundation, Inc., and Mid-America Financial Group, Inc., never filed annual Form 990s with the Internal Revenue Service.  (*See,* attached letter from the Internal Revenue Service marked as Exhibit 167.)

b.     Defendant Carroll testified that prior to selling MAG CGAs, he did not request a copy of any tax returns for MAF or MAFG.  (*See*, attached *Carroll Deposition Transcript* at 63:3-22 marked as Exhibit 16.)

c.     Defendant Crosswell admits that he did not ask for a copy of MAF's 990 tax return forms.  (*See*, attached *Crosswell Deposition Transcript* at 118:23-25 marked as Exhibit 122.)

d.     At his deposition, Davis admitted that he did not request a copy of MAF's tax returns (Form 990s).  (*See*, attached *Davis Deposition Transcript* at 70:12-19 marked as Exhibit 148.)

e.     Defendant Derk testified that he never asked to review MAF's annual IRS 990 forms. (*See*, attached *Derk Deposition Transcript* at 52:14-16 marked as Exhibit 33.)

f.     Defendant Frazier admitted that he did not have a copy of MAF's tax returns [Form 990s].  (*See*, attached *Frazier Deposition Transcript* at 49:3-5 marked as Exhibit 63.)

g.     Defendant Kerher admitted that he never requested any copies of MAF's tax returns (Form 990s).  (*See,* attached *Kerher Deposition Transcript* at 69:6-13; 19-22 marked as Exhibit 68.)

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

h.      Defendant Lankford testified that many times he requested audited financial statements and IRS Form 990s for MAF before a meeting he had in June 2000 but was never provided with any such documents.  (*See,* attached *Lankford Deposition Transcript* at 124:12:25; 125:1-16; 127:13-18 marked as Exhibit 73.)

i.      Defendant Rada admitted that he did not review any Form 990 tax returns for MAF.  (*See,* attached *Rada Deposition Transcript* at 76:1-12 marked as Exhibit 132.)

j.      Defendant Wehrly testified that he never asked MAF for any 990 tax returns for MAF. (*See,* attached *Wehrly Deposition Transcript* at 130:14-24 marked as Exhibit 137.)

**20.     MAF victims were led to believe that the purchase of a MAF CGA would provide a stream of income during the life of the annuitant (and in some cases the life of a second annuitant), with any remaining monies directed to a charity as designated by the CGA annuitant.**

a.      The MAF CGA contracts and the discovery responses of the Defendants show that the MAF victims were led to believe that the purchase of a MAF CGA would provide a stream of income during the life of the annuitant (and in some cases the life of a second annuitant) with any remaining monies directed to a charity as designated by the MAF victim upon the annuitant(s)' death.  (*See, e.g., Responses to Receiver's Interrogatory No.12*  by Defendants Bestgen, Crosswell, Davis, Derk, Frazier, Kerher, Rada, Richard, Wehrly marked as exhibits 107, 121, 145, 37, 57, 66, 129, 41, 134; *Richard Deposition Transcript* at 71:18-25 marked as Exhibit 43); *Carroll Deposition Transcript* at 66:2-14, marked as Exhibit 16.)

**21. The following Defendants admit they did not investigate the licensing background of Robert Dillie or any other Board members of MAF prior to selling MAG CGAs either by asking Dillie to identify whether he or any board members had ever had any disciplinary action taken against any of their regulatory licenses or by contacting appropriate state Departments of Insurance seeking information on Dillie or other board members.**

a.      In response to Receiver's Interrogatory No. 27 asking Defendants to identify all steps that had been taken to verify the licensing history (insurance, securities, etc.) of Robert Dillie or any other Board Members of MAF prior to the Defendants' sales of MAF CGAs, Defendant Carroll answered: None.  (*See* ,attached *Carroll Response to Receiver's Interrogatory No. 27* marked as Exhibit 15; *See also*, attached *Carroll Response to Receiver's Interrogatory No. 8* marked as Exhibit 15.)

b.      Defendant Crosswell also answered: None.  (*See,* attached *Crosswell Response to Receiver's Interrogatory No. 27* marked as Exhibit 121.  *See also*, attached *Crosswell Response to Receiver's Interrogatory No. 8* marked as Exhibit 121.)

c.      Defendant Davis also answered: None.  (*See*, attached *Davis Response to Receiver's Interrogatory No. 27* marked as Exhibit 145.)

d.      Defendant Derk also answered: None.  (*See,* attached *Derk Response to Receiver's Interrogatory Nos. 27 & 8* marked as Exhibit 37.)

e.      Defendant Frazier did not seek information from anyone independent of Mid-America.  Additionally, Defendant Frazier admitted that he had information that Robert Dillie was the president or CEO of MAF but he did not investigate the background of Dillie in the State of Arizona or any other state.  He did not confirm that

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

Dillie had a license to sell insurance or annuities. (*See*, attached *Frazier Deposition Transcript* at 33:14-18; 34:3-16 marked as Exhibit 63.)

  f. Defendant Richard also answered: None.  (*See,* attached *Richard Response to Receiver's Interrogatory No. 27* marked as Exhibit 41; *See also*, attached *Richard Response to Receiver's Interrogatory No. 8* marked as Exhibit 41.)

  g. Defendant Rada answered: None.  (*See,* attached *Rada Response to Receiver's Interrogatory No. 27* marked as Exhibit 129; *Rada Deposition Transcript* at 75:21-25, 81:9-14, marked as Exhibit 132.)

  h. Defendant Wehrly answered: None.  (*See,* attached *Wehrly Response to Receiver's Interrogatory No. 27* marked as Exhibit 134.)

  **22. All Defendants admit that they never received an audited financial statement from MAF or MAFG prior to selling MAF CGAs.**

  a. Defendant Renald Bidwell answered "no" to Interrogatory No. 29 asking him to "[s]tate whether [he had] ever requested a financial statement for Mid-America Foundation, Inc., or Mid-America Financial Group, Inc., prepared by an independent certified public accountant  . . . ."  (*See,* attached *Bidwell Response to Interrogatory No. 29* marked as Exhibit 24.)

  b. Defendant Bidwell admitted that prior to his sale of MAF CGAs that he did not possess an audited financial statement for MAF or MAFG prepared by a certified public accountant who acted independently of MAF or MFAG or persons/entities related to these entities.  (*See,* attached *Bidwell Admission to Request to Admit No. 24* marked as Exhibit 24.)

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

c.       Defendant Leonard Bestgen admits that prior to his sale of MAF CGAs, he did not possess an audited financial statement for MAF or MAFG prepared by a certified public accountant who acted independently of MAF or MAFG or persons/entities related to those entities.  (*See,* attached *Bestgen Response to Receiver's Request for Admission, No. 24* marked as Exhibit 119; *Bestgen Response to Receiver's Interrogatory No. 34* marked as Exhibit 120.)  Significantly, Defendant Bestgen stated that he requested an audited financial statement for MAF or MAFG (although he does not provide a date) and implied that Dillie had promised to provide him with one as of December 31, 1998.  (*See,* attached *Bestgen Response to Receiver's Interrogatory No. 29* marked as Exhibit 107.) As earlier set forth, Bestgen sold the CGAs prior to that date.

d.       Despite having worked as an accountant in the past (*see*, attached *Carroll Deposition Transcript* at 9:9-18 marked as Exhibit 16), Defendant Robert Carroll answered "[n]o" to Receiver's Interrogatory No. 29 asking him to "[s]tate whether [he had] ever requested a financial statement for Mid-America Foundation, Inc., or Mid-America Financial Group, Inc., prepared by an independent certified public accountant  . . . ."  (*See,* attached *Carroll Response to Receiver's Interrogatory No. 29* marked as Exhibit 15.)

e.       Defendant Carroll admitted that prior to his sale of MAF CGAs that he did not possess an audited financial statement for MAF or MAFG prepared by a certified public accountant who acted independently of MAF or MAFG  or persons/entities related to these entities.  (*See,* attached *Carroll Admission to Receiver's Request to Admit No. 24* marked as Exhibit 21.)

1        f.       Defendant Carroll admits that prior to his sale of MAF CGAs he did not

2 confirm from any source independent of MAF or MAFG persons associated with these

3 two entities, that MAF was solvent and had sufficient assets to fulfill its CGA

4 obligations.  (*See,* attached *Carroll Response to Receiver's Request for Admission No. 22*

5 marked as Exhibit 15.)

6        g.       Defendant Crosswell answered "no" to  Receiver's Interrogatory No. 29

7 asking him to "[s]tate whether [he had] ever requested a financial statement for Mid-

8 America Foundation, Inc., or Mid-America Financial Group, Inc., prepared by an

9 independent certified public accountant  . . . ."  (*See,* attached *Crosswell Response to*

10 *Interrogatory No. 29* marked as Exhibit 121.)

11        h.       When asked whether Defendant Charles Davis had ever requested a

12 financial statement for MAF or MAFG prepared by an independent certified public

13 accountant, Defendant Davis answered: "Defendant requested an audited financial

14 statement.  Defendant was given the financial disclosure statement that all donors were to

15 receive by Robert Dillie.  Dates Unknown."  (*See,* attached *Davis Response to Receiver's*

16 *Interrogatory No. 29* marked as Exhibit 145.)

17        i.       Defendant Davis admitted that prior to his sale of MAF CGAs that he did

18 not posses an audited financial statement for MAF or MAFG prepared by a certified

19 public accountant who acted independently of MAF or MAFG or persons related to those

20 entities. (*See,* attached *Davis Response to Receiver's Request to Admit iNo. 24* marked as

21 Exhibit 166.)

22        j.       When asked whether he had ever requested a financial statement for MAF

23 or MAFG that had been prepared by an independent certified public accountant,

**Guttilla & Murphy, PC**
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

1   Defendant Richard Derk responded: "No. Tom Bishop indicated there was an outside

2   firm, but no report." (*See,* attached *Derk Response to Receiver's Interrogatory No. 29*

3   marked as Exhibit 37.)

4          k.       Defendant Derk stated that he received *un*audited financial statements for

5   MAF but did not recall the exact date. (*See*, attached *Derk Response to Receiver's*

6   *Interrogatory No. 21* marked as Exhibit 37.)

7          l.       Defendant Derk admitted that prior to his sale of MAF CGAs that he did

8   not possess an audited financial statement for MAF or MAFG prepared by a certified

9   public accountant who acted independently of MAF or MAFG or persons related to those

10  entities.  (*See,* attached *Derk Response to Receiver's Interrogatory No. 24* marked as

11  Exhibit 37.)

12         m.      Defendant Orville Frazier admitted that prior to his sale of MAF CGAs, he

13  did not possess an audited financial statement for MAF or MAFG prepared by a certified

14  public accountant who acted independently of MAF or MAFG. (*See,* attached *Frazier*

15  *Response to Receiver's Request to Admit No. 24* marked as exhibit 59; *Frazier*

16  *Deposition Transcript* at 48:25; 49:1-2 marked as Exhibit 63.)  Nor did he ever request an

17  audited financial statement for MAF or MAFG.  (*See,* attached *Frazier Response to*

18  *Receiver's Interrogatory No. 29* marked as Exhibit 57.)

19         n.       Defendant Frazier admitted that prior to his sale of MAF CGAs, he did not

20  possess an audited financial statement for MAF or MAFG prepared by a certified public

21  accountant who acted independently of MAF or MAFG or persons related to those

22  entities.  (*See,* attached *Frazier Response to Receiver's Interrogatory No. 29* marked as

23  Exhibit 57; *Frazier Deposition Transcript* at 48:25; 49: 1-2 marked as Exhibit 63.)

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

68

o.     Defendant Ronald Kerher admitted that prior to his sale of Mid-America Foundation CGAs, he did not possess an audited financial statement for MAF or MAFG prepared by a certified public accountant who acted independently of MAF or MAFG. (*See,* attached *Kerher Response to Receiver's Request to Admit No. 24* marked as Exhibit 67.)

p.     When asked whether Defendant Ronald Kerher had ever requested a financial statement for MAF or MAFG prepared by an independent certified public accountant, Defendant Kerher answered:

> Defendant made requests for an audited financial statement in 1998.  He received information from marketing people in the MAF office (Tom Bishop) and legal representatives (Sara Vanucci and Felicia Majewski). Those unaudited 'summary Profit and Loss' statements were received in approximately 1999 and have previously been disclosed.  **Defendant requested Audited Financial Statements numerous times in 1999. When he did not receive an Audited Financial Statement, despite the fact that Defendant was told a Big Ten accounting firm was working on it, Defendant no longer solicited CGA sales. All sales by Defendant were completed in 1999.** (Emphasis added.)

(*See,* attached *Kerher Response to Receiver's Interrogatory No. 29* marked as Exhibit 66; see also, *Kerher's Responses to Receiver's Request to Admit Nos. 24 and 43* marked as Exhibit 67.)

q.     When asked why Defendant Ronald Kerher requested audited financial statements from MAF or MAFG as referenced in his response to Receiver's Interrogatory No. 29, Defendant Kerher responded: "Defendant believed it to be prudent and reasonable to request audited financial statements." (*See*, attached *Kerher Response to Receiver's Interrogatory No. 35* marked as Exhibit 69.)

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

1   r.      During questioning on a request for an audited financial statement from

2   MAF, Defendant Kerher answered "yes" when asked: "Would it be fair to say that you—

3   that the Foundation would be required to make payments to your clients, and you wanted

4   to ensure that it was financially sound—that Mid-America was financially sound?"  (*See,*

5   attached *Kerher Deposition Transcript* at 76:7-19 marked as Exhibit 68.)

6   s.      Defendant Kerher admitted that in the late 1990's he ordered audited

7   financial statements ". . . . and received a 'Summary Profit and Loss.'  He was told that

8   MAF was having audited financials prepared."  (*See,* attached *Kerher Response to*

9   *Receiver's Interrogatory No. 21* at (f) marked as Exhibit 66.)

10   t.      Defendant Kerher testified that he had requested an audited financial

11   statement but only received a "financial statement, but nothing audited."  (*See*, attached

12   *Kerher Deposition Transcript* at 76:20-24 marked as Exhibit 68.)

13   u.      When asked to explain why Defendant Kerher's failure to receive audited

14   financial statements from MAF was so significant that it caused him to stop soliciting

15   MAF CGA sales, Defendant Kerher responded: "Any company Defendant requests

16   something from that does not provide the information or documentation would make

17   Defendant consider looking elsewhere." (*See,* attached *Kerher Response to Receiver's*

18   *Interrogatory No. 36* marked as exhibit 69.)

19   v.      Defendant Lankford admitted that prior to his sale of MAF CGAs he did

20   not possess an audited financial statement for MAF or MAFG prepared by a certified

21   public accountant who acted independently of MAF or MAFG.  (*See,* attached *Lankford*

22   *Response to Receiver's Request to Admit No. 24* marked as Exhibit 105.)

23

w.      Defendant Lankford testified that he had never seen an audited financial statement for MAF. (*See,* attached *Lankford Deposition Transcript* at 123:15-25; 124:1 marked as Exhibit 73.)

x.      Defendant Dwight Lankford testified that toward the end of 1998, he requested an audited financial statement of Mid-America [Foundation] but he never received one.  (*See,* attached *Lankford Deposition Transcript* at 131: 11-16 marked as Exhibit 73.)

y.      In response to Receiver's Interrogatory No. 29, Defendant Lankford admitted to the following:

z.      Defendant requested an audited financial statement from Robert Dillie, Felicia Majewski, Herschel Gulley, Nelson Happy, Bo Diaz and Michael Maksudian. Received a Financial Statement dated 10/1/01.  See BMB 1773-1776.

(*See*, attached *Lankford Response to Receiver's Interrogatory no. 29* marked as Exhibit 72.)

aa.      At his deposition, Defendant Lankford testified that the financial statement he referenced in his response to Receiver's Interrogatory No. 29 was not audited.  (*See,* attached *Lankford Deposition Transcript* at 162:7-24; 164:4-8 marked as Exhibit 73.)

bb.      Defendant Lankford testified that he "wanted to see audited financial statements that would show . . . [him] that . . . [his] clients' money was safe."  An audited financial statement would have shown "[w]ell, it would have come from an auditing group whether KPMG or any of the other big ones.  And it would have shown me the audited returns, the physical returns audited and certified by that accounting group.  So . .

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

71

**Guttilla & Murphy, PC**
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

. [he] would know what they were—what their financial position was." (*See,* attached *Lankford Deposition Transcript* at 123:4-13, marked as Exhibit 73.)

cc. Defendant Lankford testified that without an audited statement there was no one who could confirm the numbers of dollars Mid-America Foundation stated it had in reserves to cover its charitable gift annuity obligations. Defendant Lankford testified, "That's why I was screaming for an audited financial statement." (*See,* attached *Lankford Deposition Transcript* at 135:18-25; 136:1-11, marked as Exhibit 73.)

dd. Defendant Lankford testified that **after he stopped selling** Mid-America Foundation, Inc., CGAs, he was "very adamant that . . . [he] wanted to see audited financial statements because 18 months had gone by and I hadn't seen any." (Emphasis added.) (*Seem* attached *Lankford Deposition Transcript* at 103:24-25; 104:1-15 marked as Exhibit 73.)

ee. Defendant Lankford testified under oath that in 1999, **after** the MAF CGAs that are the subject of the Receiver's motion for partial summary judgment against him had been sold, (excepting CGA nos. 20772 and 20922) he gave an "ultimatum, that if . . . [he] didn't have [Mid-America Foundation] audited financial statements by that time,  . .. [he] would start whatever proceedings that . . . [he] had to, to get this in front of the regulators." (*See,* attached *Lankford Deposition Transcript* at 121:1-6; 122:14:18 marked as Exhibit 73.)

ff. After Lankford threatened to take the matter to the "regulators" if he didn't receive an MAF audited financial statement in 1999, he sold two other MAF CGAs despite the undisputed fact that he still had not received an audited financial statement.

(See, *CGA nos. 20772 and 20922* marked as exhibits 103 & 104; *Lankford Deposition Transcript* at 124:12:25; 125:1-16; 127:13-18 marked as Exhibit 73.)

gg.    Defendant Lankford testified that many times he requested audited financial statements and IRS Form 990s for Mid-America Foundation, Inc., before a meeting he had in 1999 but was never provided with any such documents.  (*See,* attached *Lankford Deposition Transcript* at 124:12:25; 125:1-16; 127:13-18 marked as Exhibit 73.)

hh.    Defendant John Rada admitted that he did not request or possess a financial statement for MAF or MAFG prepared by an independent certified public accountant. (*See,* attached *Rada Response to Receiver's Interrogatory No. 29* marked as Exhibit 129; attached *Rada Response to Receiver's Request to Admit No. 24* marked as Exhibit 133.)

ii.    Defendant Richard stated the he never requested a financial statement for MAF or MAFG prepared by an independent certified public accountant.  (See attached Richard Response to Receiver's Interrogatory No. 29 marked as Exhibit 41.)

jj.    Defendant Paul Richard admitted that prior to his sale of MAF CGAs he did not possess an audited financial statement for MAF or MAFG prepared by a certified public accountant who acted independently of MAF or MAFG or persons related to those two entities.  (*See,* attached *Richard Response to Receiver's Request to Admit No. 24* marked as Exhibit 54.)

kk.    When asked if he had ever requested a financial statement for MAF or MAFG prepared by an independent certified public accountant, Defendant Patrick Wehrly admitted that he did not receive an audited financial statement. (*See*, attached *Wehrly Response to Receiver's Interrogatory No. 29* marked as Exhibit 134; *Wehrly*

**Guttilla & Murphy, PC**
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

73

1   *Response to Receiver's Interrogatory No. 32* marked as Exhibit 143.  *Wehrly Response to*

2   *Receiver's Request to Admit No. 24* marked as Exhibit 144.)

3       **23.**   **All commissions paid to Defendants were based upon the value of the**

4   **amount paid/donated by the annuitant for the MAF CGA.**

5       a.   Commissions were paid to the defendants by MAF or MAFG for the sale of

6   the MAF CGAs and were based upon the value of the amount paid/donated by the

7   annuitant for the MAF CGA.  (*See*, *e.g*., attached *CGA pay transmittal statements and*

8   *CGA ledger statements attached to CGA policies and related materials referenced* in

9   exhibits 18, 19, 27, 28, 32, 35, 36, 44-52, 60-62, 64-65, 74-104, 110-118,  123, 124, 125,

10   130, 131, 138-142, 149-165.)

11       **24.**   **The following defendants were not licensed to sell securities at the time**

12   **of their MAF CGA sales:**

13       a.   Defendant Leonard Bestgen was not licensed to sell securities at any time.

14   (*See,* attached *Bestgen Response to Receiver's Interrogatory No. 22* marked as Exhibit

15   107.)

16       b.   Defendant Renald Bidwell stated that he held securities licenses (series 63

17   and 7) from 1992-1996 (approximately.)  (*See*, attached *Bidwell Response to Receiver's*

18   *Interrogatory No. 22* marked as Exhibit 24.*)*  Accordingly, his securities licenses were no

19   longer in effect at the time of his MAF CGA sales.  Bidwell does not claim to have been

20   licensed to sell securities by the states of Illinois or Washington.  (*See*, attached *Bidwell*

21   *Response to Receiver's Interrogatory No. 22* marked as Exhibit 24.)

22       c.   Defendant Robert Carroll claimed to have held a series 7 securities license

23   although it was expired at the time of Defendant Carroll's MAF CGA sales.  (*See,*

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

74

attached *Carroll Response to Interrogatory No. 22* marked as Exhibit 15.)  Significantly, approximately six months *before* selling a MAF CGA to M. Peterson, for which a significant commission was paid as set forth *supra*, **"Desist and Refrain Orders" were directed, in part, to Defendant Carroll ordering him to desist and refrain from the offer or sale of certain promissory notes while not licensed to do so as a broker-dealer under California's securities laws.**   (*See*, attached *"Desist and Refrain Orders"* marked as Exhibit 22.)

d.     Defendant Rudy Crosswell stated he had two securities licenses NASD series 6 and 63 from 1983 to 1993.  Accordingly, his securities license had long since expired when he sold the MAF CGAs.  (*See*, attached *Crosswell Response to Receiver's Interrogatory No. 22* marked as Exhibit 121.)  Significantly, Defendant Crosswell admitted at his deposition that on July 27, 1998 (approximately six and one half months *before* he sold his first MAF CGAs underlying this litigation), he had signed a final judgment of permanent injunction with the Securities & Exchange Commission agreeing that he would not sell any securities.  (*See,* attached *Crosswell Deposition Transcript* at 122:4-11 marked as Exhibit 122.)

e.     Defendant Charles Davis held a series 6 and series 63 securities licenses from the NASD from 6/98-12/98.  (*See*, attached *Davis Response to Receiver's Interrogatory No. 22* marked as Exhibit 145.)  Accordingly, with the exception of the first two MAF CGA sold by him, Davis was unlicensed to sell securities when he sold the remaining MAF CGAs.  As to all MAF CGAs, Davis was not licensed to sell securities by the Securities Division of the Commonwealth of Massachusetts. (*See,* attached *Statement advising of lack of licensure* marked as Exhibit 146.)

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

1    f.    Defendant Dwight Lankford was not licensed to sell securities at any time.

2  (*See,* attached *Lankford Response to Receiver's Interrogatory No. 22* marked as Exhibit

3  72.)

4    g.    Defendant John Rada was not licensed to sell securities at the time he sold

5  the MAF CGAs in issue.  (*See,* attached *Rada Response to Receiver's Interrogatory Nos.*

6  *22 & 10* marked as Exhibit 129; *Rada Deposition Transcript* 11:19-25 marked as Exhibit

7  132.)

8    h.    Defendant Paul Richard was not licensed to sell securities at any time.

9  (*See,* attached *Richard Response to Receiver's Interrogatory No. 22* marked as Exhibit

10  41; *See, attached Exhibits 7 & 8 to Richard Deposition Transcript* marked as Exhibit 43.)

11    i.    Defendant Patrick Wehrly was not licensed to sell securities.  (*See,* attached

12  *Wehrly Response to Receiver's Interrogatory No. 22* marked as Exhibit 134.)

13    **25.    The following defendants have had legal action taken against them by**

14  **regulatory authorities related to their sales of securities.**

15    a.    On December 14, 1999, in a matter not known to involve the sale of MAF

16  CGAs and after selling one MAF CGA **but before selling the other**, "Desist and Refrain

17  Orders" were directed to Defendant Carroll ordering him to stop selling any security in

18  the State of California since he had offered or sold securities without having been

19  licensed as a broker-dealer in the State of California.  (*See,* attached *"Desist and Refrain*

20  *Orders"* marked as Exhibit 22.)

21    b.    In an action brought by the Securities and Exchange Commission *In the*

22  *Matter of Rudy Croswell and Paula G. Den Boer,* Administrative Proceeding File No.3-

23  9656, dated July 27, 1998, it was ordered (based upon the terms of a settlement

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

1    agreement between Defendant Crosswell and the SEC) that Defendant Crosswell was

2    suspended from association with any broker or dealer for a period of twelve months.  The

3    basis of the SEC's complaint against Defendant Crosswell was the selling of limited

4    partnership units or notes (securities) that had not been registered with the SEC and that

5    the issuer of the securities had not been properly registered as a broker-dealer.  (*See,*

6    attached *Declaration of Christine Schmidt and SEC Order in In the Matter of Rudy*

7    *Crosswell et al.,* File no. 3-9656 marked as Exhibit 128; *See,* attached *Crosswell*

8    *Deposition Transcript* at 122:4-11 marked as Exhibit 122).)

9            c.      On or about December 3, 2003, Defendant Paul Richard entered into a

10   Consent Judgment with the State of Maine and Securities Administrator in *State of Maine*

11   *and Securities Administrator v. Paul E. Richard*, Superior Court Civil Action Docket No.

12   CV-03-137.  In the Consent Judgment, Defendant Richard consented to his permanent

13   enjoinment from: 1) offering or selling securities in Maine or transacting business as a

14   securities broker-dealer or sales representative in Maine; 2) from offering or selling any

15   type of annuity or other product that contains an investment component unless certain

16   specific conditions were met; 3) from receiving referral fees or other compensation for

17   referring people to persons who provide living trust, wills or similar products; 4) and,

18   from holding himself out as providing any type of planning services to the elderly.

19   Defendant Richard also agreed to being audited quarterly and to pay a $23,000.00 fine to

20   the Securities Administrator. (*See,* attached *Richard Deposition Transcript* pps. 85:9-25;

21   86 through 90:1-6 and Exhibits 7 & 8 to Deposition Transcript marked as exhbt 43.)

22

23

**Guttilla & Murphy, PC**
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

77

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

1     d.     All of these conditions arose from Defendant Richard's sale of MAF CGAs

2    to Smith P. Theimann. (*See*, description of MAF CGAs sold to Mr. Theimann at 9.a.i. F,

3    *supra.*)

4     e.     Defendant Richard, as part of his Consent Judgment, admitted the

5    following facts:

6     4.  Defendant Richard is an adult individual residing in Augusta, Maine.  At all times relevant hereto, Richard was not licensed as a securities broker-dealer or

7    sales representative in the State of Maine.  Richard was and is an insurance agent doing business as 'Elder Planning Associates.'

8

9     5.  From mid-1997 until late 2001, Richard had a contractual relationship with Mid-America Foundation, Inc. ('Mid-America'), under which Richard sold

10    Mid-America's charitable gift annuities ('CGAs') in exchange for a 6-8% commission on sales and other compensation.

11     7.  The CGAs, as sold by Richard on behalf of Mid-America, provided for the investor to make an irrevocable gift of cash or securities to Mid-America.

12    Mid-America in turn promised to pay a rate of return to the investor (in the form of periodic payments for the rest of the investor's life) and then transfer the

13    principal to a designated charity upon the investor's death.

14     8.  In fact, the Mid-America CGAs were nothing more than a Ponzi scheme.  Mid-America used assets received from investors to make periodic

15    payments to previous investors and to fund Mid-America's Executive Director Robert Dillie's lavish lifestyle, including huge Las Vegas gambling losses.

16

17     9.  Between August 23, 1999 and January 27, 2000, Richard sold nine Mid-America CGAs to Smith P. Theimann, then an 80-year old retired social worker

18    from Gardiner.  To purchase these CGAS, Mr. Theimann paid a total of approximately $2,211,000 in cash and securities – 80% of his life savings.

19     10. At no time did Richard disclose to Mr. Theimann that Mid-America was a Ponzi scheme or that Mr. Theimann's CGA investment would be used to

20    pay other investors and to support Mid-America's Executive Director's lifestyle. Moreover, at no time did Richard disclose to Mr. Theimann that the CGAs were

21    not registered as securities with the State of Maine or that Richard was not licensed to sell securities in the State of Maine.

22

23     11.  Mid-America paid Richard approximately $144,000 in commissions and other compensation for making the sale to Mr. Theimann.

**Guttilla & Murphy, PC**
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

12.  Although Mr. Theimann received some periodic payments, the payments ceased in mid-2001.  Soon thereafter, the Ponzi scheme collapsed, and Mr. Theimann's entire investment was lost.

(*See,* attached *Richard Deposition Transcript* 85:9-25; 86:1-25; 89:1-25; 90:1-6 and exhibit 7 [4-12] and exhibit 8 attached to the Transcript marked as Exhibit 43.)

26.  **Expert Witnesses**

a.    For the past twenty-three years, Mr. Vincent Micciche, retained as an expert by the Receiver, has trained and supervised people who were licensed to sell insurance and/or securities.  (*See*, attached *Declaration of Vincent Micciche and attached expert report* marked as Exhibit 168.)

b.    In his expert report, Mr. Micciche sets forth those steps required under industry standards that Defendants were required to take before selling the MAF CGAs.  Mr. Micciche identifies several steps Defendants should have taken and states that one of the most important steps was obtaining an audited financial statement for MAF for the past three years before selling the MAF CGAs.  (*See*, attached *Declaration of Vincent Micciche and accompanying expert report* marked as Exhibit 168.)

c.    Mr. Frank Minton is the President of Planned Giving Services and the Chair of the American Counsel of Gift Annuities and has been retained by the Receiver as an expert witness.  Mr. Minton provides expertise on the effect of the payment of commissions on CGAs and an analysis of state laws in effect at the time of the MAF CGA sales.  (*See*, attached *Declaration of Frank Minton* and accompanying expert report marked as Exhibit 169.)

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

1          d.      Mr. Spencer Barasch is an attorney with the international law firm of

2   Andrews Kurth and is a former Associate Director and Assistant Director with the

3   Securities and Exchange Commission who has been retained by the Receiver as an expert

4   witness.  Mr. Barasch expertise is offered to show that the MAF CGAs are securities

5   under federal securities law.  (*See*, attached *Declaration of Spencer C. Barasch* and

6   accompanying expert report marked as Exhibit 170.)

7          27.    **SEC**

8          a.      MAF was never registered as a broker-dealer authorized to sell securities.

9   (*See*, Attestation of Larry Mills of the United States of America, Securities and Exchange

10  Commission, marked as exhibit 171.)

11          Respectfully submitted this 29th day of December, 2005.

12                              GUTTILLA & MURPHY, PC

13                              s/Ryan W. Anderson
                                Ryan W. Anderson
14                              Alisan M. B. Patten
                                Attorneys for the Receiver

15                    **PROOF OF SERVICE**

16          This is to certify that a true copy of the foregoing Statement of Facts, has been

17  filed electronically with the Court and that the persons on the attached service list

18  designated as "CM/ECF Registered" will be served with same by the Court's CM/ECF

19  system; that a proposed Order has been e-mailed to the assigned Judge with copies to all

20  persons on the attached service list designated as "CM/ECF Registered"; and that the

    other persons on the attached service list have been served with a copy of the Petition and

21  proposed Order by first class mail this 29th day of December, 2005.

22                              s/Ryan W. Anderson
                                Ryan W. Anderson

23  0758-011(47117)

                                   80

1  Burton M. Bentley
   ECF Registered
2  bmb@burtonbentley.com
   Attorney for Defendants Leonard and Elizabeth Bestgen, Robert Carroll,
3  Rudy and Mary Crosswell, David Cutshall, Charles Davis, Richard Derk, Orville Frazier,
   Ronald Kerher, Dwight Lankford, John and Candes Rada, Paul Richards, Fera Shivaee,
4  Patrick and Andrea Wehrly and Donald Muchmore

5  Brad A. Denton
   Robert Payne
6  ECF Registered
   Gunderson, Denton & Proffitt, P.C.
7  Brad@GundersonDenton.com
   Robert@GundersonDenton.com
8  Attorneys for Michael and Ann McLaughlin

9  Albert P. Massey
   ECF Registered
10 Lentz, Cantor & Massey
   massey@lentzlaw.com
11 Attorneys for Richard Wilson

12 Gregory Shebest
   ECF Registered
13 gregs@americanfamilylegal.com
   Attorney for Heritage Marketing

14

15 Martin D. Koczanowicz
   Larry Alvin Donaldson
   ECF Registered
16 Koczanowicz & Donaldson
   office@yosemitelaw.com
17 Attorneys for Ron Tucker

18 David L. Kagel
   John Torbett
19 ECF Registered
   dkagel@earthlink.net
20 jt007@dslextreme.com
   Attorneys for Paul Pichie

21

22

23

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

1

Steve A. Bryant
Steve Bryant & Associates

2

3618 Mt. Vernon Street, Suite A
Houston, TX 77006

3

Attorneys for Dwight Lankford

4

Robert Tretiak
4615 N. Ft. Apache Road

5

Las Vegas, NV 89129
Defendant Pro Se

6

7

Ren Bidwell
3430 Pacific Ave SE
Olympia, WA 98501

8

Defendant Pro Se

9

David Knutson
First Financial Center, Ltd.

10

119 Third  Street, N.E. #333
Cedar Rapids, IA 52401

11

12

David Tigges
First Financial Center, Ltd.
119 Third Street, N.E. #333

13

Cedar Rapids, IA 52401

14

Bruce F. Walters
2606 - C.W. Roosevelt Blvd.

15

Monrow, NC 28110
Defendant Pro Per

16

17

18

19

20

21

22

23

**Guttilla & Murphy, PC**
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

0758-011(26072)