IN THE UNITED STATES DISTRICT COURT

IN THE DISTRICT OF ARIZONA

----------------------------------)
                                   )
LAWRENCE J. WARFIELD, RECEIVER,    )
                                   )
                  Plaintiffs,      )
                                   )
vs.                                )  CIV'03 2390 PHX JAT
                                   )
MICHAEL ALANIZ, et al.,            )
                                   )
                  Defendants.      )
----------------------------------)


DEPOSITION OF DWIGHT NORMAN LANKFORD


Phoenix, Arizona
October 5, 2005
11:00 o'clock a.m.



REPORTED BY:  DONNA FORD TERRELL, RPR, RDR, RMR, CRR,
              CERTIFIED REPORTER #50250

**DISK
ENCLOSED**


PREPARED FOR:

MR. RYAN W. ANDERSON
Attorney at Law

CERTIFIED COPY
(When in red)

1    Q.   Okay.

2              (The court reporter marked for identification

3    Exhibit No. 2.)

4              BY MR. ANDERSON:

5    Q.   Mr. Lankford, this is a -- this is a nine-page

6    contract.  And you probably haven't seen it in a long

7    time.  So I'll give you a second, if you'd like to take a

8    look at it.  I will have a series of questions about it.

9              So let me know when you've had a chance to

10   take a look at it.

11   A.   (Witness reading.)

12             MR. ANDERSON:  Let's go off the record real

13   quick.

14             (A recess was taken from 11:34 a.m. to

15   11:37 a.m.)

16             MR. ANDERSON:  Let's go back on the record.

17   Q.   Mr. Lankford, have you had a chance to review

18   this document?

19   A.   M'hum.  Yes.

20   Q.   Do you recognize this document?

21   A.   Yes, I do.

22   Q.   And how do you recognize it?

23   A.   Well, it's got our signatures, my signature and

24   Robert Dillie's signature on it.

25             There were several revisions to it.  So I

1  would assume this was probably one of the first ones.

2        Q.   Okay.  And this is a contract between Mid-America

3  Living Trust Associates, a Missouri corporation, --

4        A.   M'hum.

5        Q.   -- and Mid-America Estate Services, a Texas

6  corporation?

7        A.   That's correct.

8        Q.   At the time that you signed this contract, did

9  you ever -- did you ever deal with Robert Dillie in

10  Missouri?

11       A.   No.

12       Q.   Okay.  Did he ever tell you anything about his

13  Missouri corporation?

14       A.   No, he didn't.

15       Q.   Okay.  And your -- your company was at this time

16  a formed entity; is that correct?

17       A.   That's correct.  It was in Texas.

18       Q.   It says here that it's Mid-America Estate

19  Services, Inc., a Texas corporation.

20             Is that just an error?

21       A.   I would assume it was, yes.

22       Q.   Okay.  Because Mid-America Estate Services was

23  never a --

24       A.   It was an L.L.C.

25       Q.   An L.L.C.  Do you know who drafted this document?

1          BY MR. ANDERSON:

2     Q.   So is it your recollection that Mid-America did

3  not make the weekly payments through the calendar year

4  1997?

5     A.   I cannot recall.

6          MR. ANDERSON:   Okay.  Let's take a

7  five-minute break.

8              (A recess was taken from 12:17 p.m. to 12:25

9  p.m.)

10             (The court reporter marked for identification

11 Exhibit No. 3.)

12          BY MR. ANDERSON:

13    Q.   If you wouldn't mind, Mr. Lankford, taking a

14 moment to look at Exhibit 3.

15    A.   (Witness reading.)

16    Q.   Have you had a chance to review that document,

17 Mr. Lankford?

18    A.   Yes.

19    Q.   Do you recognize Exhibit No. 3?

20    A.   Yes, I do.

21    Q.   How do you recognize it?

22    A.   It's got my signature on it.

23    Q.   Is that the only way you recognize it?

24    A.   Well, I -- in reading it, it's familiar.

25    Q.   Is that the Gift Annuity Agent Compensation

1       A.   Sure.  I can let Steve know.

2       Q.   Okay.  And you asked this Certified Public

3   Accountant to investigate the tax consequences with a

4   Charitable Gift Annuity?

5       A.   That's correct.

6       Q.   Do you recall what he told you?

7       A.   He gave me the rundown on what the Charitable

8   Gift Annuity could do.  And it was, to be frank with you,

9   identical to the illustrated breakdown.

10           And the first illustrated breakdowns I got

11  were from National Community Foundation.  And I didn't see

12  any change, didn't notice any change specifically from

13  those to the ones that were used by Mid-America Foundation

14  that were quote "from National Community Foundation."

15           So I -- you know, I didn't see any

16  appreciable change in any of it over the years.  I mean,

17  as a time frame, I virtually ceased doing business with

18  them in '99.

19           There was -- that was when I stopped writing

20  CGAs, with the exception of one that held over for six

21  months, and the one that -- the lady's attorney, and

22  there's other -- I won't get into a discussion of that, so

23  --.

24      Q.   Well, why did you stop selling in 1999?

25           MR. BRYANT:  Did you say '89 or '99?

1          THE WITNESS:  1999.

2          MR. BRYANT:  I thought you said 1989 in your

3 question.

4          MR. ANDERSON:  I might have.  I thought I

5 said '99 though.

6          THE WITNESS:  Beau Diaz and Mike Maksudian.

7          BY MR. ANDERSON:

8     Q.  And what about those two names made you stop

9 selling Charitable Gift Annuities?

10    A.  They went from being a very small, obscure what I

11 considered to be tightly ran -- I saw no flamboyancy, no

12 reason to question anything, other than I was at that

13 point in time very adamant I wanted to see audited

14 financial statements because 18 months had gone by and I

15 hadn't seen any.

16          And those two guys come on board.  And I

17 considered them to be reckless.

18    Q.  Did you have any evidence that they were

19 reckless?

20    A.  Didn't need a lot of evidence.  You're going from

21 an office from 12 to 13 people to 70 people in 90 days.

22 And just -- you know, takes a small office and turns it

23 into a huge office; has no real business plan.  People are

24 jetting around in private planes.

25          And it had -- it isn't rocket science to know

1  newly-formed independent company?

2          MR. BENTLEY:  Object to the form.

3          THE WITNESS:  I only thought that it was a

4  new company formed under the umbrella of the other

5  foundation.

6          BY MR. ANDERSON:

7      Q.   Thanks.

8          (The court reporter marked for identification

9  Exhibit No. 4.)

10          BY MR. ANDERSON:

11      Q.  As with the other exhibits, Mr. Lankford, if you

12  want to take a moment to review it, and let me know when

13  you've reviewed it so I can ask you a few questions.

14      A.   (Witness reading.)  Okay.

15      Q.  Mr. Lankford, is this a Marketing and Sales

16  Agreement between you and Mid-America Estate Planning and

17  Financial Group?

18      A.   Yes, it is.

19      Q.   Do you recognize the document?

20      A.   Yes, I do.

21      Q.   Is it a document that you signed on March 13th,

22  '98?

23      A.   I believe it is.

24      Q.   Is it another document much like Exhibit No. 2,

25  another sales agreement?

1      Q.   Is it accurate that when you were sent this

2  letter in 2000, you had already sold 27 of the 28 CGAs

3  that you were to sell for Mid-America Foundation?

4      A.   I think that's true.  But look at the date.  If

5  you look at the dates on the CGAs, they had stopped long

6  before this letter.  I think they stopped in '99.

7      Q.   In fact, the only CGA that you sold in 2000 was

8  the Joseph Altsizer (Phonetic) CGA in November of 2000?

9      A.   That's correct.

10     Q.   And the only CGA you sold in 2001 was Ms.

11 Drake's?

12     A.   That's correct.

13     Q.   What was the reason for the lunch meeting with

14 Robert Dillie on June 7th?

15     A.   By June, they had had their super seminar, I

16 think in January.

17          And in late, '99 after I met Beau Diaz and

18 Mike Maksudian, and I saw the changes that were being

19 made, I simply felt like that they -- in fact, that there

20 were no financial reporting being done; that I could no

21 longer do any business with them until they corrected

22 whatever it was that -- that they were short on:  990's,

23 audited financials.

24          And I felt like the leadership of the company

25 had gotten completely out of control.  I watched this

1   company go from I believe it was 11 or 12 people, to

2   almost 70 people in 90 days.  And it was -- there was no

3   sense.  There was no rhyme or reason to what they were

4   doing.

5              And their direction was 100 percent toward

6   Charitable Gift Annuities, which simply, to me, wasn't

7   workable.

8       Q.  This letter talks about -- on the second full

9   bullet point on the second page, there is a statement from

10  Mr. Maksudian to you saying, "I have been advised that the

11  Foundation is in the process of procuring the information

12  you requested in regards to the reporting issues at hand."

13             Do you know what that means?

14      A.  I had given at that meeting, a -- something of an

15  ultimatum, that if I didn't have audited financial

16  statements by that time, I would start whatever

17  proceedings that I had to, to get this in front of the

18  regulators.

19      Q.  Why did you want audited financial statements?

20      A.  I wanted to know -- I had no reason to believe

21  that there were any financial difficulties in the company

22  until this insanity in growth, explosive growth,

23  explosive -- I mean there's no question.

24             There was a huge amount of money.  It

25  quadrupled the space in offices, quadrupled the number of

1   people or more.  Computers.  I mean the money -- the

2   enormous amount of money going out was not adding up to

3   anything coming in.

4            And I wanted to see audited financial

5   statements that would show me that my clients' money was

6   safe.

7       Q.  And what do you think an audited financial

8   statement would have shown?

9       A.  Well, it would have come from an auditing group,

10  whether KPMG or any of the other big ones.  And it would

11  have shown me the audited returns, the physical returns

12  audited and certified by that accounting group.

13           So I would know what they were -- what their

14  financial position was.

15      Q.  Had you ever seen an audited financial statement

16  for Mid-America Foundation?

17      A.  The only ones I had ever seen -- pardon me.

18           MR. BRYANT:  He was close enough to the end.

19           THE WITNESS:  I almost kind let him get it

20  in.

21           BY MR. ANDERSON:

22      Q.  I sped up at the end, but she's the one that's

23  going to have trouble on these.  I mean the court

24  reporter, so --.

25      A.  The only statements I had ever seen that were

1  audited were National Community Foundation statements.

2          That was in 16 months before when I started,

3  or 14 months before.

4          BY MR. ANDERSON:

5      Q.  And who was the auditor on the statements?

6      A.  I do not recall.  It wasn't one of the Big 8

7  firms.  It was a smaller firm.

8      Q.  And who provided to you those documents?

9      A.  It came to me -- those were given to me by the

10  guys in Robert Dillie's office, along with the other

11  information from National Community.

12     Q.  You talked about I.R.S. Form 990's.

13          Did you ever receive Form 990's from anyone?

14     A.  No.

15     Q.  Why would you request Mid-America provide to you

16  Form 990's?

17     A.  Well, it -- through my work and dealing with the

18  financial people that I knew, obviously, 990's were not

19  going to be issued unless there was some form of an audit

20  that would support the tax claims in a 990.

21          I wanted -- I wanted audited financial

22  statements.  If they have audited financial statements,

23  there's actually absolutely no reason not to have a 990.

24  The I.R.S. forms would always follow the audit.

25          So I was pressing for audited financial

1  statements.  And assuming they had audited financial

2  statements, they should have put out the 990's.

3          Q.  Did you ever see 990's from Mid-America?

4          A.  No.

5          Q.  Did you ever see any tax returns from

6  Mid-America?

7          A.  No.

8          Q.  Did you request just general tax returns?

9          A.  I requested audited financial statements and

10  990's.

11          Q.  All right.

12          A.  I didn't request specific tax returns, but to me,

13  that's what the 990 was.

14          Q.  Did you make these requests at a time before your

15  meeting in June of 2000?

16          A.  Many times.

17          Q.  And how did you make those requests?

18          A.  Most of the time, I would either fly over here

19  and -- just make a general nuisance of myself.

20               I had one meeting when I had physical

21  confrontations, physical, over the board, where there were

22  hands being laid on people.

23          Q.  Tell me about that.

24          A.  Trying to -- well, I wanted information.  They

25  were stonewalling.

1   get any financial records?

2       A.   No.   That's when this -- the next time I came

3   back, I told -- I had gotten in touch with Felicia

4   Majewsky.

5               And I told her I wanted to meet with Robert,

6   and if Robert didn't want to meet with me, that I would

7   get in touch with whatever legal entities I had to, to

8   force the issue.

9               We then had a lunch meeting, and they agreed

10  to everything that this letter says they agreed to.

11              And there were some more issues.   I don't

12  remember the exact issues, but they agreed to them.

13      Q.   Okay.   Your testimony, however, is that even

14  after this meeting, you never got any audited financial

15  statements; is that correct?

16      A.   No, I did not.

17      Q.   And you never got any 990's; is that correct?

18      A.   That's correct.

19      Q.   And did you get anything that you wanted?

20              Did you get anything that Mr. Maksudian calls

21  "the reporting issues discussed"?

22      A.   No.   It become an ongoing -- it wasn't like I got

23  this letter, and that was the end of it.

24              I -- I beat the issues to death.   I was -- I

25  was given an audience with Nelson Happy, who had come into

1     A.   On annuitized accounts, they were pretty much the

2  same; wasn't a big difference in them.

3     Q.   When you say the word "annuitized," what does

4  that mean to you?

5     A.   Well, a commercial annuity that hasn't been

6  annuitized -- that means it hasn't been turned into an

7  income stream -- would not compare to a CGA.

8          If it's a standard -- if it's an open annuity

9  with no annuitization in it, it would be very different

10 from a CGA; wouldn't have the same properties.

11    Q.   Okay.  In 1998, did you request an audited

12 financial statement of Mid-America?

13    A.   I -- I don't re -- wouldn't recall.  I think it

14 was toward the end of '98 that I did, yeah.

15    Q.   Okay.  But you never received one?

16    A.   No.

17    Q.   Okay.  Did you get any financial information from

18 Mid-America in 1998?

19    A.   Yeah.  We got -- we had some copies of internal

20 financial stuff they put out.  I think it was -- it's in

21 some of the materials, I think, that I've turned in.

22    Q.   When you say "internal financial" information, do

23 you mean that that is information that was only privy to

24 Robert Dillie and to representatives of Mid-America

25 Foundation?

1  meet the annuity obligations?

2      A.   Absolutely.

3      Q.   And how did you ask that question?

4      A.   I asked that in a meeting with Craig Hampton,

5  Robert Dillie, Felicia Majewsky, and Craig Catterfeld.

6      Q.   And who answered your question in that group?

7      A.   Actually, it was answered by Robert Dillie.  And

8  Robert's habit was he would give an answer, and seek

9  confirmation from the people around him.

10         And they would -- in other words, "This is

11 where we are."  Felicia would (indicating), "Yeah, that's

12 where we are."  Craig, "Yeah, that's where we are."

13         You know, they would (indicating).  And

14 that's the answer to it.

15     Q.   So other people would confirm what Dillie told

16 you?

17     A.   That's correct.

18     Q.   Okay.  Were you shown any proof about the

19 sufficiency of the reserves for the annuity obligation?

20     A.   Only the one statement that was put out that they

21 had -- I saw one number that was 13 million that was early

22 on, when I was first starting up with them.

23         And I saw another one that was in the 26, 27

24 million.  And those were confirmed.  Those numbers were

25 confirmed by Robert Dillie, Craig Catterfeld.

1           And in many cases, Felicia would agree with

2    that.  She was the one I was most in contact with.

3        Q.  Would it be fair to say that those amounts, 13

4    million, 26 million, were only confirmed by Mid-America

5    employees?

6        A.  Yes.

7        Q.  Did you seek any confirmation of those numbers

8    from anyone outside of Mid-America?

9        A.  Without an audited financial statement, there was

10   no one to seek it from.  That was why I was screaming for

11   an audited financial statement.

12       Q.  I understand.  But the question is:  Did you seek

13   any outside confirmation --

14       A.  No.

15       Q.  -- of 13 million or 26 million?

16       A.  No.

17       Q.  Okay.  Were you aware of who managed annuity

18   investments on behalf of Mid-America?

19       A.  The early materials named three different

20   managers of the assets.  I do not have any recollection of

21   who they were.

22           But there was a lot of materials printed

23   about who was managing each percentage of the assets.

24   Mostly bond management groups.

25       Q.  Did you ever seek independent confirmation from

1    Q.   Did you speak with Lisa Mayfield?

2    A.   Yes, I did.

3    Q.   Did you get any documents from Lisa Mayfield?

4    A.   She may have sent me some -- some minor things.

5         I don't know what they were, but I don't

6    recall anything specific that Lisa gave to me.

7    Q.   In your response to Interrogatory Number 29,

8    which reads, "State whether you ever requested a financial

9    statement from Mid-America or Mid-America Financial Group

10   prepared by an independent Certified Public Accountant,

11   and if so, provide the dates of the request and to whom

12   the request was directed."

13        You answered, "Defendant requested an audited

14   financial statement from blank, Robert Dillie, Felicia

15   Majewsky, Herschel Gulley, Nelson Happy, Beau Diaz,

16   Michael Maksudian.   Received financial statement dated

17   10-1-01."

18        Is that an accurate response to your--

19   A.   If that's what I put down.

20        I've re -- I think I've said I requested

21   many, many, many times audited financial statements, from

22   1998 all the way to when they ended.

23   Q.   Do you remember getting a financial statement --

24   A.   No, I did not.

25   Q.   -- of 10-1-01?

DEPOSITION OF DWIGHT NORMAN LANKFORD          10/5/2005          164

1           (A recess was taken from 3:48 p.m. to 3:53

2  p.m.)

3           MR. ANDERSON:  Let's go back on the record.

4      Q.  Mr. Lankford, I was asking you a number of

5  questions about the financial statement of October 1, '01.

6      A.  M'hum.

7      Q.  Was that an audited financial statement?

8      A.  No.

9      Q.  Did you receive that financial statement before

10  Mid-America ceased to exist?

11      A.  I received that same financial statement several

12  times from -- a couple different agents sent it to me.  I

13  believe I received it from an internal -- one of the

14  people inside Mid-America.  I don't know if it was Dudley

15  Calhoun, Fernando Samsun (Phonetic).

16           Some of -- they started sending me stuff.  So

17  I don't have a clear recollection of where that particular

18  one came from.

19      Q.  Would you disagree with the contention that that

20  financial statement we're talking about, the one in

21  October 1, 2001, was only sent to Lisa Mayfield, the

22  Mayfield agency?

23      A.  No, because I -- I was aware of that before I --

24  I didn't even know Lisa.  Lisa called me, and I didn't

25  know who she was.  And we exchanged correspondence.

```
 1   the documents.
 2        A.  (Witness reading.)  Okay.
 3        Q.  How were you compensated by the Mid-America
 4   Foundation in the sale of a Charitable Gift Annuity?
 5        A.  They gave me commissions.
 6        Q.  And how much was your percentage of commission
 7   for the sale of a CGA?
 8        A.  Eight percent, I believe.
 9        Q.  Was it eight percent consistently throughout your
10   entire membership with Mid-America?
11        A.  I don't recall any changes in it.  It was eight
12   percent.
13        Q.  Did you ever work with other agents for sales of
14   CGAs?
15        A.  The only other agent I ever worked with was I
16   received a phone call from, I think it was Felicia, asking
17   me to contact a Jeff Sharp; that he had a client in
18   El Paso, Texas.
19            And he was proposing a Gift Annuity to her,
20   and he needed some help with it.  And I worked with Jeff
21   Sharp on that one.
22        Q.  Okay.  Did you receive a commission for working
23   with Mr. Sharp?
24        A.  Yes, I did.
25        Q.  And how -- do you recall how much a percentage of
```

# Sales and Marketing Agreement

This Agreement made and entered into this _14_ day of August 1997 by and between Mid-America Living Trust Associates, Inc., a Missouri corporation (hereinafter referred to as Mid America) and Mid America Estate Services, Inc., a Texas corporation (hereinafter referred to as "MAES");

WHEREAS, Mid-America is in the business of marketing, sales and production of estate planning documents;

WHEREAS, Mid America's subsidiary, Mid-America Financial Group, Inc. (hereinafter referred to as "MAFG"), a Delaware corporation is in the business of the marketing and sales of insurance and insurance related products;

WHEREAS, Mid-America and MAFG shall be known interchangeably and collectively in this Agreement as "Mid-America";

WHEREAS, Mid-America Foundation, Inc. (hereinafter referred to as "MAF") a Delaware non stock, non profit corporation, is a charitable organization formed to promote charitable community activities and facilitate planned gifts to MAF from MAFG's and Mid-America's clients;

WHEREAS, MAES is a recently formed entity in the business of marketing and selling of estate planning documents and selling insurance and other products related to estate planning.

WHEREAS, MAES and Mid-America desire to establish a contractual relationship to govern their respective duties, responsibilities and rights while transacting business.

NOW THEREFORE, for and in consideration of the mutual promises contained here, it is hereby agreed between the parties as follows:

## 1  AGENCY

1.1    Mid-America hereby grants MAES the right to sell estate planning documents produced by Mid-America and insurance and related estate planning products marketed and sold by MAFG. MAES and its representatives shall also be authorized to sell MAF's gift annuities and family foundations.   MAES is hereby authorized to market and sell said products in any state Mid-America is approved, authorized and licensed to sell said products.

1.2    Mid-America and MAES hereby acknowledge and agree that MAES is an independent contractor to Mid-America and its subsidiary companies.  MAES and its agents shall not be construed to be agents or employees of Mid-America for any purpose whatsoever. MAES is not and will not be treated as an employee of Mid-America for Federal, State, or Municipal Tax

1



Mid-America/MAES Sales & Marketing Agreement

purposes of any nature whatsoever, including but not being limited to Federal, State, County, Unemployment Social Security or other taxes of any type.  Further, MAES hereby specifically agrees and stipulates that it assumes full responsibility as a self employed independent contractor.

## 2  DOCUMENT SALES PRODUCTION

2.1    MAES hereby warrants sales production of 45 estate planning documents per week.  Said estate planning documents may be any document prepared by Mid-America.  All marketing payments set forth in this Agreement are contingent on said production.

2.2    The pricing of said documents shall be governed by paragraph 5 of this Agreement and Exhibits "A" and "B".  Mid-America shall deliver said documents with twenty-one (21) days from the date said document order is received by Mid-America at its corporate office in Scottsdale, Arizona unless insufficient information has been provided by MAES.

## 3  INSURANCE PREMIUM & ANNUITY PRODUCTION

3.1    MAES agrees to make its best efforts to market and sell one million dollars ($1,000,000) in insurance premium and annuities per week.  MAES shall utilize Mid-America's products in all applicable situations.  All marketing payments set forth in this Agreement are contingent on said production.

3.2    MAES agrees that any and all sales of said products will be in compliance with Federal, State and local laws MAES and its representatives shall not engage in deceptive tactics at any time..

## 4  PRODUCT AVAILABILITY & RIGHT OF FIRST REFUSAL

MAES will market and sell Mid-America's products when possible, notwithstanding the production requirements of paragraphs 2 and 3 of this Agreement.  MAES shall supply Mid-America with a list of all products necessitated by MAES in its marketing and sales efforts.  Mid-America shall use its best efforts to contract with any product providers MAES requests in writing.

## 5  PRODUCT PRICING

5.1    MAES shall be deemed to have earned the difference between the retail prices of estate planning documents set forth in Exhibit "A" and the wholesale prices set forth in Exhibit "B". MAES shall not alter or modify said prices without the express written authorization of Mid-America.

Mid-America/MAES Sales & Marketing Agreement

5.2     MAES shall execute all contracts necessary to assume a position immediately subordinate to Mid-America for all insurance and annuity products.

5.3     MAES shall receive commission for a gift annuity sales made by MAES and its agents. Said commission will be paid on a case by case basis.

# 6   NETTING AGREEMENT

6.1     Mid-America hereby agrees that MAES shall pay a net price equivalent to the wholesale price of each estate planning document to Mid-America.  MAES agrees to provide a copy of the customer's check made payable to MAES with each estate planning document order.

6.2     MAES shall establish a bank account in the corporate name of MAES.  Said account will be identified by MAES' Federal Employers Identification Number.  MAES shall not use said account for any other purpose other than MAES fees derived from the sale of estate planning documents.  Said account shall be closed within thirty (30) days of the termination of this Agreement.

# 7   REVIEW ATTORNEYS

7.1     MAES acknowledges and agrees that independent attorneys shall represent MAES' clients for estate planning document review purposes.  Mid-America's legal staff of attorneys and paralegals are not intended or to be construed to represent or serve as the legal representative of MAES clients.

7.2     MAES agrees that it shall not represent that Mid-America's legal staff represents MAES clients.  Mid-America shall serve in a capacity as a document preparation provider only.  The individual review attorneys selected by MAES' clients shall have the attorney/client relationship with their clients.  Said review attorneys shall direct Mid-America's production of estate planning documents on behalf of their clients.

7.3     MAES shall contract with its clients directly.  Said contract shall specify the relationship of Mid-America, MAES and MAES' review attorneys.  The contract form attached as Exhibit "C" shall be used.  IF MAES intends to alter, modify or revise said contract, MAES shall obtain prior written notice from Mid-America.

# 8   MARKETING MATERIALS & SUPPLIES

8.1     Mid-America agrees to supply MAES with sufficient marketing materials and supplies necessary to market Mid-America's products.  MAES shall pay the standard pricing customarily charged to Mid-America's representatives with the exception of the sample Trust.  The sample

3

Mid-America/MAES Sales & Marketing Agreement

Trust will be provided to MAES at a rate of $50 per unit for the term of this Agreement.  MAES agrees that any and all sales of said products will be in compliance with Federal, State and local laws.

8.2     MAES agrees to use Mid-America's marketing materials and supplies in the sale of Mid-America's products.  MAES acknowledges and agrees that Mid-America's and MAF's marketing materials and supplies are the proprietary property of Mid-America and MAF.  MAES agrees not to duplicate, copy or alter Mid-America or MAF's marketing materials and supplies at any time without the prior written authorization of an authorized agent of Mid-America or MAF.

8.3     Upon the termination of this Agreement, MAES will deliver to Mid-America and MAF all marketing materials and supplies in its possession to Mid-America and MAF within seven (7) days.  Mid-America will refund MAES for all marketing materials and supplies with fourteen (14) days of receipt.

## 9   MARKETING REIMBURSEMENT

9.1     Mid America and MAES executed a Letter of Intent on August 8, 1997.  Said Letter of Intent provided for an initial schedule of these payments.  Effective immediately, the terms outlined in said Letter of Intent shall be superseded by the terms of this Agreement.

9.2     Mid-America shall pay MAES four thousand nine hundred dollars ($4,900) per week to be used by MAES for sales and marketing expenses of Mid-America products.  Said marketing reimbursement shall be paid by Mid-America to MAES in addition to the difference between the wholesale price and retail price earned by MAES as described in paragraph 5 of this Agreement.

9.3     The marketing reimbursement paid by Mid-America to MAES of four thousand nine hundred dollars ($4,900) per week shall be contingent and conditional upon MAES production requirements described in paragraphs 2 and 3 of this Agreement If MAES fails to perform in accordance with paragraphs 2 and 3 of the Agreement, Mid-America may immediately cease and terminate said payments.  Said marketing reimbursement may also be terminated by Mid-America if Mid-America determines said funds are not used by MAES to market Mid-America products.

9.4     Mid-America in its sole discretion may terminate said marketing reimbursement payments without cause with fourteen (14) days written notice to MAES.

4

Mid-America/MAES Sales & Marketing Agreement

## 10  AUTHORIZATION TO USE NAME

10.1    Mid-America hereby authorizes MAES to use the name "Mid-America Estate Services, Inc." for the term of this contract.  MAES acknowledges and agrees that the name Mid-America Estate Services is the sole proprietary property of Mid-America. MAES agrees to dissolve its corporate entity with the State of Texas within one (1) year of the termination of this Agreement.

10.2    MAES acknowledges and agrees that it will cease and desist from using any Mid-America name or name deceptively similar to Mid-America within one (1) year of the termination of this Agreement.   MAES further acknowledges and agrees that Mid-America shall be entitled to injunctive relief and damages should MAES use the name "Mid-America Estate Services, Inc." or any names which are deceptively similar to Mid-America and its subsidiaries without prior authorization pursuant to this Agreement.

10.3    MAES acknowledges and agrees that Mid-America's logo, corporate colors, agent lists and products are the proprietary products of Mid-America.  MAES shall immediately cease and desist from using Mid-America's logo, corporate colors or products upon termination of this Agreement.  Mid-America shall be entitled to injunctive relief and damages should MAES use Mid-America's logo, corporate colors or products after the termination of this Agreement.

## 11  AGREEMENT NOT TO RECRUIT

11.1    MAES and Mid-America acknowledge and agree that each company's employees and agents are critical to the operation of each respective company.

11.2    MAES and Mid-America mutually agree that MAES and Mid-America shall not recruit each others employees or agents without express written authorization from the other company.

11.3    MAES and Mid-America shall be entitled to injunctive relief and damages against the other party for violation of this provision.

## 12  TERM AND TERMINATION

12.1    The term of this Agreement shall be for a period of three (3) years from the date hereof unless this Agreement is terminated for cause as provided in sub paragraph 10.3 hereof or either party gives thirty (30) days notice in writing to terminate to the other party.

12.2    This Agreement shall be automatically terminated in the following event involving either MAES, Mid-America or MAF; (i) fraud committed by an organization or any principal of an organization; (ii) assignment for the benefit of creditors or (iii) bankruptcy or (iv) upon any event legally or contractually causing a termination of the corporation.

Mid-America/MAES Sales & Marketing Agreement

12.3    Mid-America may terminate this Agreement for cause, at any time without prior notice, if MAES shall (i) withhold or misappropriate any money or other property belonging to Mid-America; (ii) subject Mid-America to liability due to MAES' misfeasance or malfeasance; (iii) commit an act of embezzlement; (iv) fail to comply with laws, rules or regulations of any Federal, State, or other governmental agency or body having any jurisdiction under this Agreement; or (v) fail to conform to the rules and regulations of Mid-America as communicated to MAES from time to time, or (vi) commit any fraud.

12.4    If this Agreement is terminated for cause, all commissions and fees shall, at Mid-America's option, terminate and MAES shall be liable to Mid-America for such acts including liability for damages for which Mid-America may have been subjected by virtue of such act or acts allowing such termination.  For purposes of determining whether this Agreement has been breached for cause, the acts of all MAES employees or agents, as the case may be, shall be deemed the acts of MAES.

12.5    In the event of termination for cause or without cause MAES shall be entitled to said marketing reimbursements described in paragraph 7 of this Agreement only as long as MAES' incoming production meets or exceeds the requirements described in paragraphs 2 and 3 of this Agreement.

## 13  NOTICES

Any and all notices required or permitted by this Agreement shall be sent by U. S. certified mail, postage pre-paid, return receipt requested, to each respective party to the address set forth below until further notice.

Mid-America Living Trust Associates, Inc.          Mid-America Estate Services, Inc.
Attn: Robert R. Dillie, President                          Attn: Dwight Lankford, President
8630 E. Via De Ventura                                      363 North Beltway 8 West, Suite 1100
Scottsdale, AZ 85258                                          Houston, TX 77060

## 14  COMPLIANCE WITH LAWS

MAES and Mid-America mutually represent and warrant to each other that each has complied with all Federal, State, and local laws, statutes, rules, regulations, orders and ordinances applicable.

## 15  MODIFICATION

This Agreement represents the whole agreement of the parties.  All previous agreements between the parties are hereby merged into and are superseded by this Agreement.  Any revisions,

Mid-America/MAES Sales & Marketing Agreement

modifications or changes to the terms of this Agreement shall be in writing and executed by all parties or their authorized representatives named herein.  Mid-America and MAES hereby agree to amend this Agreement to conform with any and all requirements of applicable law.

## 16  INDEMNIFICATION

Mid-America agrees to indemnify and hold harmless MAES against all acts, claims and liabilities of Mid-America and its employees including attorneys fees, costs, and expenses.  MAES agrees to indemnify and hold Mid-America harmless from the acts of MAES and its agents from all acts, claims and liabilities including attorneys fees, costs and expenses.

## 17  WAIVER

MAES  and Mid-America hereby specifically agree that failure of either party to enforce any of its rights specified in this Agreement shall not constitute waiver thereof, nor in any way bar or prohibit such party from later asserting such rights under this Agreement.

## 18  APPLICABLE LAW & JURISDICTION

This Agreement and its terms, shall be enforced and interpreted in accordance with the laws of the State of Arizona.  Arizona shall serve as the appropriate jurisdictional forum for all disputes arising out of or relating to the terms of this Agreement.

Mid-America Living Trust Associates, Inc.
Robert R. Dillie, President

Dated: _8 - 2 6 - 9 7_

Mid-America Estate Services, Inc.
Dwight Lankford, President

Dated: _8/26/97_

7

Mid-America/MAES Sales & Marketing Agreement

# Exhibit - A

## Retail Price of Trust

| | | |
|---|---|---|
| 1. | Revocable Living Trust | $1895 |
| 2. | Charitable Unitrust | $1295 |
| 3. | Charitable Remainder Trust | $1295 |
| 4. | Charitable Lead Trust | $1295 |
| 5. | Irrevocable Trust | $1195 |
| 6. | Irrevocable Insurance Trust | $ 995 |
| 7. | Qualified Personal Residence Trust | $1495 |
| 8. | Family Limited Partnership | Per quote |
| 9. | Limited Liability Company | Per quote |

Mid-America/MAES Sales & Marketing Agreement

# Exhibit - B

## Wholesale Price of Trust

| | | |
|---|---|---|
| 1. | Revocable Living Trust | $650 |
| 2. | Charitable Unitrust | $795 |
| 3. | Charitable Remainder Trust | $795 |
| 4. | Charitable Lead Trust | $795 |
| 5. | Irrevocable Trust | $650 |
| 6. | Irrevocable Insurance Trust | $595 |
| 7. | Qualified Personal Residence Trust | $995 |
| 8. | Family Limited Partnership | Per quote |
| 9. | Limited Liability Company | Per quote |



## MID-AMERICA FOUNDATION
## GIFT ANNUITY AGENT COMPENSATION AGREEMENT

Mid-America Foundation and _Dwight Lankford_ hereinafter referred to as "the Agent", hereby agree and acknowledge to the following terms and conditions effective this _11th_ day of _March_, 1998 _A_

### PRIOR AGREEMENTS

1.  It is expressly understood that this contract does not supersede any prior agreements between Mid-America Foundation and the Agent. Any prior agreements between Mid-America Foundation and Agent shall remain in full force and effect except where expressly modified by this contract and in the case of conflict, this contract shall control  Any agreement relative to compensation payable under existing business previously issued shall continue to be paid in accordance with the terms thereof.

### GENERAL PROVISIONS

1.  Agent acknowledges and warrants that pursuant to the terms of this Agreement he is an agent of Mid-America Foundation.

2.  Agent acknowledges and agrees that Agent will duly and properly advise all Mid-America Foundation clients of any and all investment opportunities prior to client executing a Gift Annuity Contract.

3.  Agent shall act in the client's best interest and operate in good faith at all times.

4.  Nothing in this contact shall create, or be construed to create, the relationship of employer and employee between Mid-America Foundation and Agent.

5.  Agent warrants that Agent is licensed by all applicable governmental agencies having jurisdiction as needed and shall operate Agent's business in strict conformance with all applicable laws and regulations.

6.  Any sales material, supplies, advertising or printed promotional matter mentioning Mid-America Foundation by name may be used, or permitted to be used, only with the company's prior written approval.



DL3754

## AUTHORIZATION

1.  Agent is authorized to solicit and submit applications for Gift Annuity Contracts subject to the rates, rules and regulations of Mid-America Foundation as of this date and to any changes in Mid-America Foundation make from time to time.  Mid-America Foundation reserves the right to accept or reject, in their absolute discretion, any such applications for Gift Annuity Contracts.

## COMMISSION

1.  Mid-America Foundation shall pay to the Agent a commission as set forth on Commission Addendum A.

## MODIFICATION

1.  Mid-America Foundation reserves the right to alter, amend, modify, or terminate this Agreement, and its commission schedule at any time without prior notice to Agent.

2.  Any alteration, amendment, modification or termination will have prospective application only and will not affect commissions or trailer commissions due at the time of said schedule change.

## TERMINATION

1.  Mid-America Foundation reserves the right to terminate this contract for cause at any time without prior notice.

2.  This contract may be terminated for cause, if Agent subjects Mid-America Foundation or its agents to liability due to:  (i) Agent's misfeasance or malfeasance, (ii) an act of embezzlement, (iii) failure to comply with the laws, rules or regulations of any Federal State or other governmental agency or body having proper jurisdiction, (iv) failure to conform to the rules and regulations of Mid-America Foundation promulgated from time to time, or (v) commission any fraud.

3.  If agent is terminated for cause, Agent will forfeit any and all commissions, including trailer commissions on existing Gift Annuity Contracts.

## INDEBTEDNESS

1. Any sum that may be advanced or loaned to the Agent by Mid-America Foundation and any charge-backs or other debts to Agent's commission account as any be shown on the records of Mid-America Foundation, whether arising under this contract or otherwise, shall be and become a debt of the Agent to Mid-America Foundation. Any such indebtedness to the company shall be repayable in full by the Agent and shall constitute a first lien on any commission or other compensation due or to become due to the Agent under this contract or otherwise and may be deducted from commission or other compensation to become due to the Agent.

## INDEMNIFICATION

1. Agent hereby agrees to indemnify and hold harmless Mid-America Foundation from any fraudulent or intentional acts and the subsequent results as a result of Agent's conduct.

## ENTIRE AGREEMENT

1. This Agreement sets forth all (and is intended by the parties to be an integration of all) of the representations, promises, agreements and understandings between the parties hereto, whether written or oral, and there are no representation, promises, agreements or understandings, oral or written, expressed or implied, between them other than as set forth or incorporated herein.

DATED: _3/11/98_
(Signature)

_Dwight Lankford_, Agent
(Print)

DATED: _Robert R. Dillie_
MID-AMERICA FOUNDATION
By: Robert R. Dillie, Executive Director

DL3756

## MID-AMERICA FOUNDATION
## GIFT ANNUITY COMMISSION SCHEDULE
## ADDENDUM A

| AGENT LEVEL | COMPENSATION PLAN A | COMPENSATION PLAN B |
|---|---|---|
| Master General Agent | 8% of the face amount of the Gift Annuity | 6% of the face amount of the Gift Annuity and an annual trailer commission of 25 basis points of the face amount per year |

DL3757

*Lankford*
EXHIBIT NO. *4*
*10-5-05*
D. TERRELL

## MARKETING AND SALES AGREEMENT

THIS AGREEMENT is hereby entered into this *13th* day of *March*, 1998, by and between MID-AMERICA ESTATE PLANNING, INC. and MID-AMERICA FINANCIAL GROUP, INC., Delaware corporations, (hereinafter referred to as "MID-AMERICA") and DWIGHT LANKFORD.

WHEREAS, MID-AMERICA will make a substantial amount of resources available to DWIGHT LANKFORD, including, but not limited to, professional training, marketing materials, extensive product selection and comprehensive field support; and

WHEREAS, MID-AMERICA's information in relation to its associates, agreements, clients, marketing data base, marketing materials and proposals are of a highly sensitive and proprietary nature; and

WHEREAS, DWIGHT LANKFORD desires to become affiliated with MID-AMERICA in an effort to enhance his product portfolio and his professional knowledge in the area of insurance, annuity products and estate planning documents; and

WHEREAS, DWIGHT LANKFORD desires to market and sell MID-AMERICA products exclusively; and

WHEREAS, MID-AMERICA currently has existing Agents in its field force in the state of Texas; and

WHEREAS, MID-AMERICA desires to appoint a Captive Agent for the state of Texas.

NOW IN CONSIDERATION OF THE MUTUAL PROMISES MADE BY THE PARTIES HEREIN, IT IS HEREBY AGREED TO AS FOLLOWS:

1.   APPOINTMENT

Upon the execution of this Agreement, MID-AMERICA will appoint DWIGHT LANKFORD as General Agent of MID-AMERICA. By virtue of said appointment of DWIGHT LANKFORD, he will be empowered and authorized to represent MID-AMERICA to market and sell all MID-AMERICA authorized products. DWIGHT LANKFORD is hereby granted authority to recruit Agents to his organization. Said Agents will be bound to the terms of this Agreement. If DWIGHT LANKFORD terminates this Agreement, it shall terminate with respect to all parties.

2.   TERRITORY

MID-AMERICA hereby grants DWIGHT LANKFORD territorial rights to MID-AMERICA's Texas territory. Said territory shall not include any existing MID-AMERICA Agents who have contracted directly with MID-AMERICA prior to the execution date of this Agreement. MID-

AMERICA reserves the right to terminate this territorial Agreement if DWIGHT LANKFORD fails to meet the production requirements described in this Agreement or further agreed to by the parties in writing.

## 3.   LEADS

MID-AMERICA agrees to provide DWIGHT LANKFORD leads for the Texas territory for the period of this Agreement.  DWIGHT LANKFORD agrees to aggressively pursue said leads and make his best effort to market and sell MID-AMERICA products.  DWIGHT LANKFORD shall market and sell MID-AMERICA products exclusively from said leads.  MID-AMERICA retains the right to audit said leads.

## 4.   MARKETING SUPPLIES AND SUPPORT

MID-AMERICA shall make available to DWIGHT LANKFORD all personnel and supplies to assist in DWIGHT LANKFORD's marketing and sales efforts.  All marketing supplies shall be provided to DWIGHT LANKFORD at MID-AMERICA's cost.  MID-AMERICA agrees to deliver estate planning documents prepared by MID-AMERICA within twenty-eight (28) days of DWIGHT LANKFORD's order, unless said order is incomplete or uncontrollable events occur which prevent MID-AMERICA from delivering in a timely fashion.

## 5.   DISCLOSURE

DWIGHT LANKFORD shall deliver a copy of his respective state insurance license report to MID-AMERICA within seven (7) days of the execution of this Agreement.  DWIGHT LANKFORD shall request said report from its Agents and provide said reports to MID-AMERICA immediately upon an Agent's appointment or Agent's first sale whichever occurs first.  DWIGHT LANKFORD hereby authorizes and agrees that MID-AMERICA can verify said licenses every thirty (30) days.

## 6.   PRODUCTION

Within ninety (90) days of the execution of this Agreement, DWIGHT LANKFORD shall produce fifteen (15) Revocable Living Trusts per week.  Within ninety (90) days of the execution of this Agreement, DWIGHT LANKFORD shall produce Five Hundred Thousand Dollars ($500,000.00) annuity premium, life insurance premium, and/or gift annuity premium per week.  Within one hundred eighty (180) days of the execution of this Agreement, DWIGHT LANKFORD shall produce One Million Dollars ($1,000,000.00) of annuity premium, life insurance premium and/or gift annuity premium per week.

MID-AMERICA shall pay DWIGHT LANKFORD a performance bonus of one percent (1%) on all cumulative business written by DWIGHT LANKFORD and/or his agents once the total amount of business written by DWIGHT LANKFORD and/or his agents exceeds One Million Seven Hundred Fifty Thousand ($1,750,000.00) including, but not limited to, annuity premiums, life insurance

premiums and/or gift annuity premiums. This bonus shall be retroactive for all business written by DWIGHT LANKFORD and/or his agents during 1998 once gross sales exceed One Million Seven Hundred Fifty Thousand ($1,750,000.00) Dollars. All business written and submitted by DWIGHT LANKFORD and/or his agents to Mid-America from January 1, 1998 shall be considered for said bonus. This performance bonus will be paid on December 10, 1998. Any business written from December 3, 1998 to the anniversary date of the Agreement, shall be carried over into the term of a new Agreement, if a new Agreement is entered into between the parties.

## 7.    SALES EXPENSES

MID-AMERICA shall pay One Thousand Five-Hundred ($1,500.00) per week to DWIGHT LANKFORD for sales expenses. Said payment shall be contingent upon performance of production requirements by DWIGHT LANKFORD as specified in Paragraph 6 of this Agreement. MID-AMERICA hereby reserves the right to terminate or suspend the payments specified in this paragraph at any time in its sole discretion.

## 8.    PRODUCTS

DWIGHT LANKFORD shall notify MID-AMERICA in writing of any and all products DWIGHT LANKFORD desires to sell within fourteen (14) days of the execution of this Agreement. MID-AMERICA shall make its best efforts to have said products available to DWIGHT LANKFORD within thirty (30) days of receipt of said notice. DWIGHT LANKFORD must have prior written notice from MID-AMERICA to sell products which are not approved or which are not authorized products by MID-AMERICA. DWIGHT LANKFORD will remove companies not approved by MID-AMERICA from any and all state insurance licenses held by him.

## 9.    PRODUCT PRICING

DWIGHT LANKFORD shall market and sell the MID-AMERICA estate planning documents according to the price schedule attached as "Exhibit A". MID-AMERICA shall pay commissions to DWIGHT LANKFORD for the sale of the MID-AMERICA estate planning packets according to the schedule attached. Charitable Gift Annuity compensation shall be paid to DWIGHT LANKFORD in accordance with Exhibit B.

## 10.    MARKETING MATERIALS & SUPPLIES

MID-AMERICA agrees to supply DWIGHT LANKFORD with sufficient marketing materials and supplies necessary to market MID-AMERICA products. DWIGHT LANKFORD shall pay the standard pricing customarily charged to MID-AMERICA's representatives. DWIGHT LANKFORD agrees that any and all sales of said products will be in compliance with Federal, State and local laws.

DWIGHT LANKFORD agrees to use MID-AMERICA's marketing materials and supplies in the sale of MID-AMERICA's products. DWIGHT LANKFORD acknowledges and agrees that MID-AMERICA's marketing materials and supplies are the proprietary property of MID-AMERICA.

DWIGHT LANKFORD agrees not to duplicate, copy or alter Mid-America's marketing materials and supplies at any time without the prior written authorization of an authorized agent of MID-AMERICA.

Upon the termination of this Agreement, DWIGHT LANKFORD will deliver to MID-AMERICA all marketing materials and supplies in its possession to MID-AMERICA within seven (7) days. MID-AMERICA will refund DWIGHT LANKFORD for all marketing materials and supplies within fourteen (14) days of receipt.

## 11.    AUTHORIZATION TO USE NAME

MID-AMERICA hereby authorizes DWIGHT LANKFORD to use the name MID-AMERICA ESTATE SERVICES, LLC (herein after referred to as "MAES") for the term of this Agreement. DWIGHT LANKFORD acknowledges and agrees that the name "MAES" is the sole proprietary property of MID-AMERICA. DWIGHT LANKFORD agrees to dissolve his corporate entity with the State of Texas within thirty (30) days of the termination of this Agreement.

DWIGHT LANKFORD acknowledges and agrees that he will cease and desist from using any MID-AMERICA name or names deceptively similar to MID-AMERICA within thirty (30) days of the termination of this Agreement. DWIGHT LANKFORD further acknowledges and agrees that MID-AMERICA shall be entitled to injunctive relief and damages should DWIGHT LANKFORD use the name MID-AMERICA ESTATE SERVICES, LLC, or any names which are deceptively similar to MID-AMERICA and its subsidiaries without prior authorization pursuant to this Agreement.

DWIGHT LANKFORD acknowledges and agrees that MID-AMERICA's logo, corporate colors, agent lists and products are the proprietary products of MID-AMERICA. DWIGHT LANKFORD shall immediately cease and desist from using MID-AMERICA's logo, corporate colors, agent lists and products upon termination of this Agreement. MID-AMERICA shall be entitled to injunctive relief and damages should DWIGHT LANKFORD use MID-AMERICA'S logo, corporate colors, agent lists and products after termination of this Agreement.

DWIGHT LANKFORD hereby acknowledges and agrees that he is sole shareholder of Mid-America Estate Services, LLC. DWIGHT LANKFORD further acknowledges that he is responsible for the debts and liabilities of MAES.

## 12.    AGREEMENT NOT TO RECRUIT

DWIGHT LANKFORD and MID-AMERICA acknowledge and agree that each company's employees and agents are critical to the operation of each respective company. DWIGHT LANKFORD and MID-AMERICA mutually agree that they shall not recruit each other's employees or agents without express written authorization from the other company. DWIGHT LANKFORD and MID-AMERICA shall be entitled to injunctive relief and damages against the other party for violation of this provision.

Page 4

## 13.   COMPENSATION

MID-AMERICA and DWIGHT LANKFORD hereby agree to a 70/30 split on all insurance, annuity and related sales.  This split shall be based off MID-AMERICA'S contract rate.  DWIGHT LANKFORD shall receive seventy percent (70%) of all life insurance, annuity and related sales commissions and MID-AMERICA shall receive thirty percent (30%) of said commissions from sales procured by DWIGHT LANKFORD and/or his Agents.

## 14.   REPORTING

DWIGHT LANKFORD shall deliver a written report to Robert R. Dillie, President of MID-AMERICA, via facsimile and U.S. Mail, every Monday, commencing on February 16, 1998, for the previous week's production and/or activities.  Said report will identify leads received, cases opened, referrals received, Agent's under contract, leads acted on, estate planning document sales, insurance product sales, annuity product sales and gift annuity sales.

## 15.   RELEASE OF ALL CONTRACTS

DWIGHT LANKFORD hereby acknowledges and agrees that he is released, discharged and free of any previous contractual obligations pertaining to the marketing and sales of life insurance, annuity and estate planning products.  DWIGHT LANKFORD hereby agrees and acknowledges to indemnify and hold MID-AMERICA harmless against any causes of actions or claims made by or on behalf of any entities claiming a contractual interest in the sales procured by DWIGHT LANKFORD and/or his Agents.

## 16.   TERM AND TERMINATION

The term of this Agreement shall begin on the day and year first written above and shall continue for a term of one (1) year, unless sooner terminated by either party provided herein.  Either party may terminate this Agreement upon thirty (30) days prior written notice to the other in the event that the other party (i) becomes the subject of any bankruptcy, receivership or insolvency proceeding under federal or state law, (ii) becomes the subject of any proceeding, investigation or inquiry regarding with its compliance with any applicable law, rule or regulation, or (iii) either party commits any material breach of this Agreement.

## 17.   NON-COMPETE AGREEMENT

During the term of this Agreement, DWIGHT LANKFORD hereby agrees that he and his Agents will not compete directly or indirectly with a competing entity of MID-AMERICA.  A competing entity shall be construed for purposes of this Agreement as any entity which markets and/or sells any products similar or the same as MID-AMERICA's products.

18.   **LEGAL COMPLIANCE**

DWIGHT LANKFORD and MID-AMERICA represent and warrant that they have the full right, power and authority to enter into this Agreement and to perform the services described herein, and that they will obtain and will maintain licenses, permits, registrations, certificates and authorizations required by applicable federal, state, local law, rule or regulation.

19.   **RELATIONSHIP TO THE PARTIES**

No partnership or joint venture between DWIGHT LANKFORD and MID-AMERICA is made or intended as a result of this Agreement.  Neither party shall have the authority to act on behalf of, contract for, bind or otherwise represent the other unless expressly authorized by the terms of this Agreement or by a subsequent written instrument.

20.   **NOTICE**

All notices, consents, waivers, directions or other instruments or communications, required or allowed under the terms of this Agreement shall be in writing, signed by the party giving the same and shall be deemed properly given if:  (a) three (3) business days after mailing if sent by registered or certified United States Mail, postage prepaid, (b) upon delivery, if sent by facsimile transmission, or (c) upon delivery, if sent by overnight courier.  In each case, all communications shall be sent to the applicable address indicated below, or to such other address as either party may hereafter designate in writing to the other:

TO:

> **DWIGHT LANKFORD**
> **363 N. Sam Houston Parkway East, Suite 110**
> **Houston, TX 77060**
> **FAX (281) 405-2624**

TO:

| | |
|---|---|
| **MID-AMERICA LIVING TRUST ASSOCIATES, INC.** | **MID-AMERICA FINANCIAL GROUP, INC.** |
| **8630 E. Via de Ventura, Suite 100** | **8630 E. Via de Ventura, Suite 100** |
| **Scottsdale, AZ 85258** | **Scottsdale, AZ 85258** |
| **Fax (602) 483-2063** | **Fax (602) 483-2063** |
| **ATTN: Robert R. Dillie** | **ATTN: Robert R. Dillie** |

21.   **REMEDIES AND DAMAGES**

DWIGHT LANKFORD acknowledges and agrees that he will be given access to proprietary information owned by MID-AMERICA during the term of this Agreement.  DWIGHT LANKFORD further acknowledges and agrees to immediately return any and all proprietary property of MID-AMERICA upon termination of this Agreement.  MID-AMERICA shall immediately be entitled to injunctive relief and/or damages upon breach of this Agreement.

22.     **CONSTRUCTION AND PRONOUNS**

Wherever the context hereof admits or requires, words in the singular may be regarded as in the plural and vice versa and personal pronouns may be used as masculine, feminine or neuter.

23.     **HEADINGS**

Title of sections are inserted for convenience of reference only and in the event of any conflict between the text of this Agreement and such titles or headings, the former shall control.

24.     **SEVERABILITY**

If any provision of this Agreement shall be held invalid or unenforceable, such invalidity or unenforceability shall not affect any other provision hereof, and this Agreement shall be construed and enforced as if such provision had not been included.

25.     **APPLICABLE LAW**

This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of Arizona.

26.     **ASSIGNABILITY**

This Agreement may not be assigned without the prior written consent of each party hereto.

27.     **MODIFICATIONS**

No modification to this Agreement shall be effective unless it is in writing and is properly executed by each party hereto.

28.     **ENTIRE AGREEMENT**

This Agreement sets forth all (and is intended by the parties to be an integration of all) of the representations, promises, agreements and understanding between the parties hereto, whether written or oral, and there are no representation, promises, agreements or understandings, oral or written, expressed or implied, between them other than as set forth or incorporated herein.

DWIGHT L ANKFORD, Individually

Date: 3/13/98

MID-AMERICA ESTATE
PLANNING, INC.

BY:

Date: 3-13-98

MID-AMERICA FINANCIAL
GROUP, INC.

BY:

Date: 3-13-98

# MID-AMERICA FOUNDATION
## GIFT ANNUITY COMMISSION SCHEDULE
## ADDENDUM A

| AGENT LEVEL | COMPENSATION PLAN A | COMPENSATION PLAN B |
|---|---|---|
| Master General Agent | 8% of the face amount of the Gift Annuity | 6% of the face amount of the Gift Annuity and an annual trailer commission of 25 basis points of the face amount per year |